# EXHIBIT "1"

## Page 1

```
 1            UNITED STATES DISTRICT COURT
 2              DISTRICT OF NEVADA
 3
    AMY VILELA, an individual;
 4  JOZETTE FIGUEREDO, an individual;
    AMY VILELA, a Special Administrator
 5  of the Estate of SHALYNNE RAMOS,
 6       Plaintiffs,
 7     vs.      CASE NO. 2:16-CV-01503
 8  VALLEY HEALTH SYSTEM, LLC, d/b/a
    CENTENNIAL HILLS HOSPITAL MEDICAL
 9  CENTER, a Nevada Limited Liability
    Company; UNIVERSAL HEALTH SERVICES
10  OF DELAWARE, INC., a Delaware
    corporation; TANYA NETZ, PAC; JILL
11  MCATEE, RN; DOE Defendants I
    through X, inclusive; ROE NURSES
12  I through XX, inclusive; ZOE
    HOSPITALS or OTHER MEDICAL
13  FACILITIES I through X; and
    ROE CORPORATIONS I through X,
14  inclusive,
15       Defendants.
    ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
16         DEPOSITION OF
17      LELAND JAMES NELSON
18
          July 9, 2018
19
          10:00 a.m.
20
21      7900 West Sahara Avenue
          Suite 200
22      Las Vegas, Nevada
23
24   Gary F. Decoster, CCR No. 790
25
```

## Page 2

```
 1         APPEARANCES OF COUNSEL
 2
 3  For the Plaintiffs:
 4       LAW OFFICES OF CASEY D. GISH
         CASEY D. GISH, ESQ.
 5       5940 South Rainbow Boulevard
         Las Vegas, Nevada  89118
 6       702.583.5883
         702.483.4608 Fax
 7       casey@gishlawfirm.com
 8
 9  For the Defendants Valley Health System, LLC
    d/b/a Centennial Hills Hospital Medical Center
10  and Jill Mcatee, RN:
11       HALL PRANGLE & SCHOONVELD, LLC
         CASEY TYLER, ESQ.
12       1160 North Town Center Drive
         Suite 200
13       Las Vegas, Nevada  89144
         702.889.6400
14       702.384.6025 Fax
         ctyler@hpslaw.com
15
16
    For the Defendant Tanya Netz, PAC:
17
         JOHN H. COTTON & ASSOCIATES, LTD.
18       TODD WEISS, ESQ.
         7900 West Sahara Avenue
19       Suite 200
         Las Vegas, Nevada  89117
20       702.832.5909
         702.832.5910 Fax
21       tweiss@jhcottonlaw.com
22
23
24
25
```

## Page 3

```
 1         INDEX OF EXAMINATION
 2
 3  WITNESS:  LELAND JAMES NELSON
 4
 5  By Mr. Tyler              4
 6  By Mr. Weiss             78
 7  By Mr. Gish              88
 8  By Mr. Weiss             89
 9  By Mr. Gish              90
10
11
12
13
14
15
16
17         INDEX TO EXHIBITS
18
                        Initial
19  Exhibit    Description      Reference
20
     A      Text messages        69
21
22
23
24
25
```

## Page 4

```
 1      Deposition of Leland James Nelson
 2          July 9, 2018
 3      (Prior to the commencement of the
 4  deposition, all of the parties present agreed to
 5  waive statements by the court reporter, pursuant
 6  to Rule 30(b)(4) of NRCP.)
 7
 8      LELAND JAMES NELSON, having been first duly
 9  sworn, was examined and testified as follows:
10            EXAMINATION
11  BY MR. TYLER:
12   Q.  Good morning.  I introduced myself briefly
13  before we went on the record.  My name is Casey Tyler.
14  I represent Valley Health Systems, which would be
15  Centennial Hills Hospital, in certain litigation
16  that's been filed on behalf of Shalynne as well as her
17  family.
18      You're here to testify as a fact witness
19  regarding certain circumstances that happened with
20  regard to the underlying facts of the case; do you
21  understand that?
22   A.  Yes.
23   Q.  Okay.  Have you ever given a deposition
24  before?
25   A.  No.
```

LELAND J. NELSON                                    July 09, 2018
VILELA vs VALLEY HEALTH SYSTEM                            5–8

Page 5

1    Q.  I'm going to run through what we call the
2  admonitions; just a fancy word for the rules of the
3  deposition, all right?
4    A.  Okay.
5    Q.  You just took an oath.  The oath you took is
6  the same oath you would take if you were sitting on
7  the stand in the courtroom, same obligation to tell
8  the truth, same penalties apply if you don't tell the
9  truth; do you understand that?
10    A.  Yes.
11    Q.  You're doing a really good job of answering
12  my questions, giving me verbal answers.  You're also
13  nodding your head.
14       It's important that we give verbal answers,
15  so if you nod your head or shrug your shoulders, I may
16  say is that a yes, is that a no.  I'm not trying to be
17  rude.  I just want to make a clear record for the
18  court reporter, okay?
19    A.  Okay.
20    Q.  Okay.  Same thing with uh-uh, uh-huh.  It may
21  not be clear what you mean on that.  We may say again,
22  is that a yes, is that a no, okay?
23    A.  Okay.
24    Q.  You're also doing a really good job of
25  letting me finish my questions before you answer.  In

Page 6

1  normal speech pattern, we tend to talk over each
2  other.  I'll try to let you finish your answer and you
3  try to let me finish my question, okay?
4    A.  Okay.
5    Q.  Certain points there may be objections made
6  by one of the attorneys.  If they make an objection,
7  just stop whatever you're saying at that point, let
8  them get that objection out there, and then you'll
9  still answer the question unless instructed otherwise,
10  okay?
11    A.  Okay.
12    Q.  There will be a transcript that is created of
13  this testimony.  That will come back.  It will be a
14  booklet.  It will look like a script for a movie or a
15  play.  It will be verbatim everything we talk about
16  here today.
17       You get a chance to review that if you choose
18  to, and you can make changes to that.  I have to
19  caution you, though, if you make a major substantive
20  change, that's something we can make a comment upon to
21  test your credibility.
22       What I mean by that is, let's pretend this
23  was a car wreck case and you said today during your
24  testimony, I'm not sure what color the light was, I
25  had spilled my coffee and I was texting.  Then you

Page 7

1  went back and you rewrote it and said I had a green
2  light, the other car came out of nowhere, that's
3  something we can test your credibility on because it's
4  such a major substantive change.
5       Similarly, if you testify at trial in this
6  matter and you're on the stand and you testify that
7  you had the green light, we can bring up your
8  transcript from today and show you that in fact you
9  said earlier under oath that it was a red light, you
10  were texting and you weren't paying attention; do you
11  understand that?
12    A.  Yes.
13    Q.  Okay.  For that same reason, it's very
14  important that you give your best testimony today, so
15  if you don't understand one of my questions, it's just
16  a poorly worded question, you need some clarification,
17  let me know; because otherwise when you answer that
18  question, we're going to assume that you understood it
19  and that your answer was the appropriate answer for
20  that question --
21    A.  Okay.
22    Q.  -- do you understand?  Okay.
23       Is there anything that would inhibit your
24  ability to testify today?
25    A.  No.

Page 8

1    Q.  Okay.  Please give us your full name.
2    A.  Leland James Nelson.
3    Q.  And what's your address?
4    A.  2828 Windstorm Avenue.
5    Q.  Is that Las Vegas?
6    A.  Yes.
7    Q.  What's the ZIP code?
8    A.  I just moved there.  I want to say 89032.
9    Q.  What's the closest major cross streets?
10    A.  Simmons and Lake Mead.
11    Q.  And are you employed?
12    A.  Yes.
13    Q.  Where at?
14    A.  FedEx.
15    Q.  And what do you do there?
16    A.  I'm a courier.
17    Q.  How long have you worked there?
18    A.  I have been there for six years.
19    Q.  And would I be correct in assuming you were
20  employed there during the applicable time frame we're
21  going to be talking about today?
22    A.  Yes.
23    Q.  Okay.  Do you have any kind of medical
24  training?
25    A.  No.

LELAND J. NELSON
VILELA vs VALLEY HEALTH SYSTEM

July 09, 2018
9–12

Page 9

1    Q.   You ever worked in any kind of hospital
2   setting?
3    A.   No.
4    Q.   Okay.  And don't be offended by this.  I ask
5   everyone this question.  Have you ever been convicted
6   of a felony or a crime of dishonesty?
7    A.   No.
8    Q.   What did you do to prepare for today's
9   deposition?
10    A.   I looked over my affidavit.
11    Q.   Anything else?
12    A.   And I talked to Mr. Gish about the
13   deposition.
14    Q.   When did you talk to him?
15    A.   Last night.
16    Q.   And what did you guys discuss?
17    A.   My affidavit and to prep me for today.
18    Q.   Do you have any specific recollection of that
19   discussion?  I mean, was it just walking through the
20   affidavit and make sure you know these facts or
21   did you discuss things that have substantively
22   happened in the lawsuit?
23    A.   Just what's on my affidavit and pretty much
24   told me just tell the truth, so . . .
25    Q.   Were there any discussions about other

Page 10

1   people's testimony in the case?
2    A.   No.
3    Q.   Were there any discussions about the facts of
4   the case that are outside of the content of the
5   affidavit?
6    A.   No.
7    Q.   Okay.  Anything else you remember about that
8   discussion?
9    A.   No, other than just tell the truth.
10    Q.   How long did you talk?
11    A.   About an hour.
12    Q.   I'm assuming prior to that at some point
13   you've met with Mr. Gish before?
14    A.   Yes.
15    Q.   When was that?
16    A.   I met with him about a couple years ago.
17    Q.   And describe for me the context of that
18   meeting.
19    A.   It was just about my affidavit and for him
20   to -- and he typed it up.
21    Q.   Was this meeting arranged by Amy?
22    A.   No, it was arranged by Mr. Gish.
23    Q.   Okay.  So I'm assuming that his office
24   reached out to you?
25    A.   Yes.

Page 11

1    Q.   Okay.  And then you were asked to come in for
2   a meeting?
3    A.   Yes.
4    Q.   Okay.  And then during that meeting, did you
5   have discussions about what you recall of the events?
6    A.   Yes.
7    Q.   Okay.  In terms of the content of the
8   affidavit, is that all information that was provided
9   by you or is that something that was pretty much a
10   finished product and you just said yeah, that looks
11   good?
12    A.   No, I provided all the information.
13    Q.   Okay.  And did you have anything -- any input
14   on the finished product or was that something that was
15   typed up after that meeting based on the conversation?
16    A.   No, I gave everything.
17    Q.   I'm assuming you read it over before you
18   signed it?
19    A.   Yes.
20    Q.   Okay.  Did you feel all that information was
21   accurate at that time?
22    A.   Yes.
23    Q.   Do you still feel that that information is
24   accurate?
25    A.   Yes.

Page 12

1    Q.   Okay.  Any other meetings with Mr. Gish's
2   office?
3    A.   No.
4    Q.   Have you had any other discussions with
5   Shalynne's family about the status of the litigation
6   since you did your affidavit?
7    A.   No.
8    Q.   Talk to anybody else about the lawsuit other
9   than Mr. Gish to get ready for today?
10    A.   No.
11    Q.   We had previously noticed your deposition and
12   you weren't able to appear; do you recall that?
13    A.   Yes.
14    Q.   Okay.  Could you explain for me what happened
15   on that date?
16    A.   I didn't -- I didn't see the -- I guess he
17   e-mailed me, and I rarely check my e-mail, so I never
18   saw it, and when I asked about it, it was like the day
19   of.
20    Q.   Okay.  Did you have a work conflict or what
21   was the problem?
22    A.   I just didn't -- I didn't check my e-mail and
23   then I didn't see it.
24    Q.   Okay.  So when you first realized that the
25   deposition was that day, it was after it had already

LELAND J. NELSON                                                July 09, 2018
VILELA vs VALLEY HEALTH SYSTEM                                     13–16

Page 13

1  started or --
2     A.  Yeah, it was already too late.
3     Q.  Okay.  Any other conversations with anyone
4  regarding the facts of this lawsuit other than when
5  you initially did your affidavit and then your prep
6  session last night?
7     A.  Can you repeat that?
8     Q.  Sure.  Did you have any other conversations
9  with anybody regarding the facts of this litigation
10 other than your initial meeting with Mr. Gish to do
11 your affidavit and then your prep session last night?
12    A.  No.
13    Q.  Do you still have any kind of relationship
14 with Shalynne's family?
15    A.  Yes.
16    Q.  What kind of relationship?
17    A.  Talk now and then, see how each other's
18 doing, and that's about it.
19    Q.  And who would that be with?
20    A.  Her mom, Amy.
21    Q.  Amy?
22    A.  Yeah.
23    Q.  How frequently do you talk to Amy?
24    A.  Once every couple months or around Shalynne's
25 birthday or anniversary of her death.

Page 14

1     Q.  Is that usually on the phone, text message,
2  Facebook?
3     A.  Phone.
4     Q.  Anyone else?
5     A.  No.
6     Q.  When was the last time you talked to her?
7     A.  I think couple weeks before -- maybe
8  beginning of June, I want to say, beginning of June.
9     Q.  During these conversations, have you
10 discussed the lawsuit at all?
11    A.  No.
12    Q.  Okay.  When did you first meet Shalynne?
13    A.  I met her in November.
14    Q.  Of what year?
15    A.  Of 2015 -- no, '14, 2014.
16    Q.  And how did you guys meet?
17    A.  Online dating.
18    Q.  Was it a particular site or --
19    A.  Yeah, it was . . .
20    Q.  Do you remember what it was?
21    A.  Oh, it was Tinder.
22    Q.  Okay.  Do you know whether or not she was
23 still married at that time?
24    A.  No, I don't know.
25    Q.  Okay.  Did you guys have some sort of date or

Page 15

1  meeting that month?
2     A.  Yes.
3     Q.  Okay.  And at that point did you begin to
4  date or what was the status of your relationship?
5     A.  Just talking.
6     Q.  At this juncture, did she still live in
7  Missouri?
8     A.  Yes, but she was thinking about moving, yes.
9     Q.  Okay.  When you first began communicating
10 with her online in November of 2014, was she in
11 Las Vegas visiting her mom, was she still in Missouri,
12 do you know one way or another?
13    A.  She was in Las Vegas.
14    Q.  Okay.  When did you guys first meet in
15 person?
16    A.  In November 2014.
17    Q.  Okay.  Could you describe for me how your
18 relationship progressed up to the time that she moved
19 to Las Vegas permanently?
20    A.  We eventually became boyfriend and
21 girlfriend.
22    Q.  Was there a period there where it was long
23 distance?
24    A.  Yeah.
25    Q.  Okay.  Why don't you just describe for me the

Page 16

1  frequency that you had as far as communication and
2  interaction with her from meeting her in November
3  through her moving here in May.
4     A.  All right.  Well, we talked every day and we
5  talked at Facetime every day, and then I went out to
6  see her in March for about a week and a half, and then
7  when I went back, we talked all the way till she moved
8  out here.
9     Q.  When you went to visit her in March, was she
10 having any kind of problems with her leg?
11    A.  Yes.
12    Q.  What do you recall the problems being?
13    A.  Her knee was -- her knee was hurting and like
14 her lower leg was hurting, lower leg, like around the
15 calf area.
16    Q.  And do you know if this would have been early
17 March, mid-March, end of March?
18    A.  For --
19    Q.  When you went to visit her.
20    A.  It was late March.
21    Q.  Okay.  Did she provide you any specific
22 description of how her knee or lower leg were hurting?
23    A.  It was just -- she just said it just hurt
24 really bad at that time.
25    Q.  Do you know if she'd sought any kind of

LELAND J. NELSON
VILELA vs VALLEY HEALTH SYSTEM

July 09, 2018
17—20

Page 17

1 medical care?
2   A.   I don't know.
3   Q.   Did she give you any kind of indication how
4 long it had been hurting?
5   A.   Since maybe January.
6   Q.   Did you have any kind of idea of what the
7 cause of it was or what she thought the cause of it
8 was?
9   A.   She was playing a game with her brother and
10 she felt it do like a little tweak or something.
11   Q.   And you say felt a little tweak, was that in
12 her knee?
13   A.   Yeah, I think she said it was like in her
14 knee.
15   Q.   So you'd mentioned her knee and lower leg.
16 Was her primary concern her knee or was it also the
17 part below the knee?
18   A.   At that time, I know it was the knee.  Then
19 later on, like I know when she got there, it was her
20 lower leg.
21   Q.   When you say got there, you mean when she
22 moved to Vegas?
23   A.   Got to Vegas, yes, sorry.
24   Q.   Okay.  Did she provide you any other
25 explanation or further description of her leg pain

Page 18

1 when you were visiting in March?
2   A.   No.
3   Q.   Did you observe any physical limitation, for
4 example, she was limping, she couldn't walk?
5   A.   Like whenever she like actually walked a
6 certain way and if it like popped or something, of
7 course she was limping then.
8   Q.   Do you know if she had any intention at that
9 point in time to seek medical care regarding her leg?
10   A.   I don't know.
11   Q.   After that visit to Missouri in March, late
12 March, did you see her in person again before she
13 moved to Las Vegas?
14   A.   No.
15   Q.   When's the first time you saw her when she
16 arrived in Las Vegas; do you remember the date?
17   A.   May 20 -- I want to say May 28th, 2015.
18   Q.   Okay.
19   A.   The first day she got there, I seen her.
20   Q.   So just so we're clear on the dates, because
21 it's not a memory contest for you, but the affidavit
22 that you signed says that she drove to Las Vegas on
23 May 23rd.
24   A.   Okay.
25   Q.   And that she arrived on May 25th.

Page 19

1   A.   Okay.
2   Q.   And it says that you personally observed
3 swelling.  So do you think it was the 25th or do you
4 think it was the 28th?
5   A.   Well, it might have been the 25th, just I
6 remember we was going to a concert that day, so it was
7 the first day she got there, I seen her.
8   Q.   Okay.  Was that the Kevin Hart show?
9   A.   Yeah.
10   Q.   Okay.  And that was at Mandalay Bay?
11   A.   Yeah.
12   Q.   So let's back up for a second.
13       After your visit in March up until you first
14 saw her in late May, did you have any other
15 conversations with her regarding her leg?
16   A.   No.
17   Q.   Was it anything she mentioned at all during
18 Facetime or phone calls?
19   A.   No, not really.
20   Q.   Do you know if she sought any medical care in
21 that window?
22   A.   Not that I know -- I don't really know.
23   Q.   Okay.  Now, when you see her on what we think
24 was probably the 25th, where did you meet her?
25   A.   She came to my place so we could go to the

Page 20

1 concert.
2   Q.   And I'm assuming that was a different
3 apartment since you just moved.
4   A.   Yeah, that was -- that was a whole different
5 apartment.
6   Q.   Do you remember where that was?
7   A.   3260 Fountain Falls Way.  I can't remember
8 the apartment.
9   Q.   Was it just the two of you?
10   A.   It was me, her and her friend that helped --
11 that helped her drive out here.
12   Q.   Do you remember her name?
13   A.   Kaylyn.
14   Q.   And were the three of you together all night?
15   A.   Yes.
16   Q.   Okay.  What do you recall as far as
17 Shalynne's condition with her leg when you first saw
18 her that day?
19   A.   It was -- it seemed normal at that point.  I
20 mean, she said it was hurting, like she had like a
21 little limp, but it was pretty much normal than what
22 it was.
23   Q.   Did she specifically say it was hurting?
24   A.   No.
25   Q.   Did she mention at all anything about her

LELAND J. NELSON                                    July 09, 2018
VILELA vs VALLEY HEALTH SYSTEM                      21–24

Page 21

1  leg?
2      A.  That night?  No.
3      Q.  And I shook my head yes.
4          Did you notice anything out of the ordinary
5  that night?
6      A.  No.
7      Q.  Okay.  Did she say anything about any kind of
8  problems during the drive out or issues with her leg?
9      A.  Yeah, her leg was hurting.
10     Q.  To the best of your recollection, can you
11 tell me verbatim what she told you that night about
12 the drive out?
13     A.  She just said it was long and whenever her
14 leg really started -- like when it started hurting,
15 she had her friend drive so she could give her leg a
16 rest.  That was about it.
17     Q.  Did she describe at all how it was hurting?
18     A.  Just the normal pain that she's had,
19 just . . .
20     Q.  So kind of like the tweak we had talked about
21 when she -- after she'd hurt it?
22     A.  Yeah, like it was like, yeah, like it hurt
23 kind of thing.
24     Q.  Any other specifics about how it might have
25 hurt or when it might have hurt?

Page 22

1      A.  Like how -- like she just -- she just told me
2  that it was just like her knee.
3      Q.  Any other complaints she had regarding her
4  lower leg that you recall that night?
5      A.  No.
6      Q.  Okay.  And as far as her ability to attend
7  the concert and go out with you that night, no --
8      A.  It was fine, yeah.
9      Q.  That show, was that in a theater, was it at
10 the beach, do you remember where it was?
11     A.  It was in the theater.
12     Q.  Okay.  No problems getting around -- Mandalay
13 Bay is a big place; she didn't have a problem getting
14 around?
15     A.  No.
16     Q.  Okay.  Did you -- I'm assuming you guys
17 probably did more than go just to the show and
18 straight home?
19     A.  Yeah, we went to -- we walked around the
20 Strip.
21     Q.  Do you remember, did you go all the way from
22 Mandalay to the Stratosphere or --
23     A.  No, we went from Mandalay to -- I don't even
24 remember -- Mandalay to the -- only thing I remember
25 is that we saw Chewbacca, that was it, and then after

Page 23

1  that we turned back around.  So I don't know exactly
2  where that was at, but that's the only thing I can
3  remember from that.
4      Q.  Somebody dressed up as Chewbacca?
5      A.  Yeah.
6      Q.  Okay.  I know a lot of times those people are
7  like in front of the Bellagio; do you think it was
8  there or --
9      A.  No, I don't think we went that far.  I think
10 it was like -- I want to -- I want to say maybe it was
11 a little bit past the M & M Store, so I don't know
12 what hotel that is off the top of my head.
13     Q.  The one where like there's like an arcade and
14 stuff there?
15     A.  I don't know if there's an arcade.  I just
16 know there's like the M & Ms are out there.  I've
17 never actually been inside the store.
18     Q.  It's on the opposite side of the Strip, like
19 across the street from the Mandalay Bay side?
20     A.  Yeah.
21     Q.  Okay.
22     A.  Yeah, it's over there.
23     Q.  So kind of like by New York-New York?
24     A.  Somewhere around there, yeah.
25     Q.  Okay.  Any problems walking around?

Page 24

1      A.  Well, toward the end, she started saying
2  that -- you know, she was starting -- her leg was
3  starting to hurt, so we walked back.
4      Q.  And was it your impression it was the knee?
5      A.  Yeah.
6      Q.  Did you notice any kind of swelling?
7      A.  Not that night.  I didn't look.
8      Q.  When did you next see her?
9      A.  I think I saw her the next day.
10     Q.  And what was the context of your meeting?
11     A.  The concert and if she had a good time.
12     Q.  Okay.  Did you meet her at your apartment,
13 did you go to --
14     A.  I went to Amy's, where she was staying.
15     Q.  Now we would have been on the 26th probably?
16     A.  Yeah.
17     Q.  Okay.  Any particular observations or
18 complaints regarding her leg?
19     A.  No, not that I can remember.
20     Q.  Okay.  I'm sure you probably saw her between
21 the 26th and the 3rd, but the 3rd is the date where
22 the -- she did something to exacerbate her knee and
23 went to the hospital.
24         In between the 26th and the 3rd, any
25 complaints at all about the leg or any observations

LELAND J. NELSON                                           July 09, 2018
VILELA vs VALLEY HEALTH SYSTEM                              25–28

Page 25

1  you recall?
2      A.  No, not that I can remember.
3      Q.  So that would have been about a week.  During
4  that week, did you see her more?
5      A.  Yeah.
6      Q.  Every day or --
7      A.  Yeah, pretty much.
8      Q.  Okay.  And you've kind of already answered
9  this question, but during that time frame where you
10  see her every day for the next seven days or so, no
11  observations of any problems, no complaints about the
12  lower leg?
13     A.  None that I can remember.
14     Q.  During that time frame, any kind of
15  additional activities outside of the house, go to more
16  shows, concerts, hiking, anything like that?
17     A.  I know, I mean, me and her went on some
18  dates.
19     Q.  Any recollection of what you guys did?
20     A.  Just went out to eat, saw a movie.  Just went
21  out to eat and saw movies, that's it.
22     Q.  Okay.  Anything that would cause physical
23  exertion on her leg?
24     A.  No.
25     Q.  Okay.  And as far as you recall during these

Page 26

1  dates, no problems, complaints, observations?
2      A.  From -- you talking about from that week from
3  the concert, right?  No.
4      Q.  Up until that day of the 3rd of June, any
5  other recollection of any problems or observations
6  about the leg that we haven't talked about?
7      A.  No.
8      Q.  Okay.  Do you know whether she was working at
9  that time frame?
10     A.  No, but she was looking for jobs.
11     Q.  And what do you recall her looking for as far
12  as jobs?
13     A.  She was a CNA -- yeah, CNA, so she was
14  looking for CNA jobs.
15     Q.  And as far as you know, other than the time
16  she spent with you, was she at her mom's house?
17     A.  Yeah.
18     Q.  I forgot the name of her friend, but her
19  friend that drove out with her, do you recall them
20  discussing going on a hike together?
21     A.  No, I don't remember that.
22     Q.  Okay.  Do you know whether or not they did go
23  hiking?
24     A.  I don't really remember.
25     Q.  Did Shalynne ever provide any kind of

Page 27

1  complaints about her inability to complete the hike or
2  any problems with the hike?
3      A.  I don't know.
4      Q.  On May 26th, did you go to Drai's nightclub
5  with Shalynne?
6      A.  No, I had to work.
7      Q.  On the 29th, did you go to Encore Beach Club?
8      A.  No, I had to work.
9      Q.  Okay.  What about the Bow Wow and Jermaine
10  Dupri concert?
11     A.  Uh-uh, had to work.
12     Q.  How about on the 31st, did you go to the
13  Encore Beach Club?
14     A.  No.
15     Q.  Okay.  Were you aware that Shalynne went to
16  those events?
17     A.  Yes.
18     Q.  Okay.  Do you recall her having any kind of
19  problems attending those events or complaints about
20  her leg?
21     A.  No.
22     Q.  So I'm going to turn our attention to the
23  3rd, okay?  And I'll represent to you, at least
24  according to your affidavit, that was the date that
25  you -- I think you and her were doing something and

Page 28

1  she hurt her knee, and then that also comports with
2  the medical records as to when she went to Centennial
3  Hills Hospital.  So what I'd like to do is start with
4  kind of where you guys met, what you were doing that
5  day prior to the hospital.
6      A.  We were at her house -- well, Amy's house.
7  We were swimming in the back in the pool, and then we
8  was playing around and I picked her up, and when I --
9  and I was putting her down, I thought like her legs
10  were like planted or at least one leg was planted so
11  all she had to do was put another leg down, but her
12  legs wasn't and I dropped her and she fell right on
13  her knee.
14     Q.  Okay.  I want to make sure I understand how
15  this worked.  You were out on the side of the pool,
16  like on the pool decking?
17     A.  Oh, no, no, okay.
18     Q.  Or you were in the pool?
19     A.  We was at the pool.  Then we got out the
20  pool, dried off, got in the house, and that's when we
21  start playing around.
22     Q.  Okay.
23     A.  And that's when I picked her up, thought one
24  leg was down, but it wasn't, and I dropped her and she
25  fell on her knee.

LELAND J. NELSON
VILELA vs VALLEY HEALTH SYSTEM

July 09, 2018
29–32

Page 29

1    Q.   Okay.  So when you say pick her up, like
2  around her midsection?
3    A.   Yeah, like midsection, yeah.
4    Q.   Okay.  And then you were going to set her
5  back down, you thought her feet were underneath her,
6  but instead she went down onto her knees?
7    A.   Yeah, because she was still in the air.  I
8  didn't realize.
9    Q.   Okay.  Do you know, was this on tile or
10  carpet or --
11    A.   I can't remember what the floor was.
12    Q.   Okay.
13    A.   It wasn't on carpet, I do know that.
14    Q.   As far as the physical impact point, though,
15  it would have been directly onto her knees?
16    A.   Yeah, like, it was like on her knee, and as
17  soon as she did, she like rolled over and like just
18  was just grabbing like her knee.
19    Q.   Prior to that event, did she have any
20  complaints about her leg that day?
21    A.   That day, no.
22    Q.   At that time frame when this initially
23  happened, was it your impression that it was just her
24  knee that was hurting?
25    A.   Yeah, that's all I thought was just her knee.

Page 30

1    Q.   And was anybody else present?
2    A.   When it happened, I think her dad was there
3  -- or stepdad, sorry, stepdad, stepdad -- and her two
4  like little, little brothers were there.
5    Q.   Those are step-siblings?
6    A.   Yeah.
7    Q.   Okay.
8    A.   Well, half siblings.
9    Q.   Yeah, okay.  So there's the impact.  Now walk
10  me through what happens next.
11    A.   Me and her stepdad help her out, get to the
12  car, and then I drove her to the hospital.
13    Q.   So once she hits the ground, you said she
14  immediately rolled over.  Did she make any specific
15  complaints like, ow, my knee or anything like that?
16    A.   Yeah, she was like -- because it was like the
17  main impact was pretty much like her like knee, so she
18  was like grabbing like her knee and like the lower
19  part of her knee, and so she was like, ow, my knee, my
20  knee, that's it.
21    Q.   Did you guys have any discussions with
22  anybody else prior to getting her in the car and
23  heading towards the ER?
24    A.   I think her -- I think her stepdad told her
25  mom.

Page 31

1    Q.   And when you say told her mom, called her?
2    A.   Yeah, like called her and told her what --
3  you know, that we got to take her to the hospital.
4    Q.   Any specific recollection of that
5  conversation?
6    A.   No.
7    Q.   Any other discussions prior to deciding to go
8  to the hospital?
9    A.   Say it again.
10    Q.   Sure.  Do you recall any other discussions
11  prior to deciding going to the hospital?
12    A.   I just -- the only ones I had was like
13  can you move it?  She said no, it hurts.  I told her
14  do you want -- I was like, well, I asked her what do
15  you want to do, do you want to go to the hospital or
16  do you want to try to -- what do you call it, maybe
17  just like elevate it and just let it like, you know,
18  calm down or whatever?  And she said no, I got to go
19  to the hospital, so . . .
20    Q.   Throughout this time frame until you were in
21  the car on the way, is it your impression it's just
22  her knee bothering her?
23    A.   In the car?  Yeah, it was like she was pretty
24  much saying her knee because I think that was the
25  thing that -- because she fell exact like pretty much

Page 32

1  directly on it, so that was all that was hurting at
2  that time.
3    Q.   And just so we're completely clear, this is
4  the same knee that had been bugging her --
5    A.   Yes.
6    Q.   -- the whole time you knew her?
7    A.   Yes.
8    Q.   Okay.  And was it at least your impression
9  that this is just something that had exacerbated that
10  existing knee injury?
11    A.   Yeah, at the time that's all I thought.
12    Q.   Okay.  How did you guys pick Centennial
13  Hills?
14    A.   It was the closest one.
15    Q.   Any other phone calls to anybody prior to
16  arriving at the ER?
17    A.   Not that I can remember.
18    Q.   Is it just the two of you that arrived there?
19    A.   Her stepdad followed us.
20    Q.   Was he right behind you or he showed up a
21  little while later?
22    A.   I can't remember.
23    Q.   Okay.
24    A.   I just remember -- like I do remember him
25  being there as soon as -- as soon as I parked, I do

LELAND J. NELSON                                          July 09, 2018
VILELA vs VALLEY HEALTH SYSTEM                            33–36

Page 33

1  remember him being there, so . . .

2     Q.  And just him or did he have the other kids
3  with him, too?

4     A.  I think it was just him because I think the
5  babysitter maybe was -- I think the babysitter maybe was --
6  was she there?

7     Q.  You'd probably remember little kids running
8  around an ER, though.  They weren't there?

9     A.  Yeah, they weren't -- I know the kids weren't
10  there.  I know the little kids weren't there.

11     Q.  Okay.  So when you first walked in the
12  hospital, all three of you were present?

13     A.  It was -- I want to say -- no, actually, no,
14  it was just me and Shalynne, and then the dad came
15  about maybe five minutes later.

16     Q.  So once you walk into the ER, I'm assuming
17  you go over to the intake area?

18     A.  Um-hum.

19     Q.  That's a yes, right?

20     A.  Oh, yes.

21     Q.  Okay.  Describe for me then what happens once
22  you get to the intake area.

23     A.  She goes up there.  She tells them, you know,
24  her knee hurts.  And she's calmed down a little bit
25  then, so she's like my knee and like my lower leg is

Page 34

1  starting like -- is starting to hurt.  And then they
2  asked to have her fill out paperwork and they ask if
3  she has insurance.

4     Q.  As far as what she initially complained, she
5  told them her knee hurts.  What -- do you remember
6  anything specific or you just remember just generally
7  this is what she said?

8     A.  Like I just remember her saying that her knee
9  hurts and that her leg is starting to hurt because she
10  -- like I said, she calmed down some, so it was like
11  she started feeling --

12     Q.  Okay.  She starts to fill out the paperwork.
13  They ask if she has insurance.  Then what happens
14  next?

15     A.  She says no, she says she doesn't have
16  insurance, and they say, you know, well, we don't know
17  how much -- how much we -- what we can -- how much we
18  can do because you don't have insurance.

19     Q.  They said we don't know how much we can do
20  because you don't have insurance?

21     A.  Yes.

22     Q.  And this is the same intake person?

23     A.  Yes.

24     Q.  Okay.  What happens next?

25     A.  She -- her stepdad is there, so he tried to

Page 35

1  see if he can -- if he can do something to where she
2  can be on his insurance or if it's possible that she
3  can be on his insurance, and he's on the phone with
4  his insurance people.  I guess they pretty much said
5  that no, and then we sit and wait.

6     Q.  At what point had the stepdad arrived?  Is
7  that while she's filling out the paperwork?

8     A.  She's filling out the paperwork.  By the time
9  we got the paperwork he came already.  He was already
10  there sitting down with us.

11     Q.  Okay.  When they said -- when she told them
12  that she didn't have insurance, did they say that we
13  can't treat you at all or just that it might be really
14  expensive or do you remember any of the specifics
15  about how that conversation went?

16     A.  Well, they said we might not be able to help
17  out that much and it's going to be -- that she did --
18  that they said it's going to be -- that it could
19  possibly be really expensive if you don't have
20  insurance.

21     Q.  So they never specifically said we won't
22  treat you.  They just said without your insurance,
23  this might cost a lot of money?

24        MR. GISH:  Asked and answered,
25  mischaracterizes his testimony.

Page 36

1        Go ahead, you can answer.

2  BY MR. TYLER:

3     Q.  You can answer.

4     A.  Oh.  Say it again.

5     Q.  Sure.  It wasn't something where they
6  specifically said, well, if you don't have insurance,
7  tough luck, we're not going to treat you.  It was more
8  of something along the lines of we might be able to
9  treat you, but it might cost you a lot of money?

10        MR. GISH:  Same objections.

11        Go ahead and answer.

12        THE DEPONENT:  Well, I remember them saying
13  it was going to be expensive and I remember them
14  saying that we don't know how much we can possibly
15  help you.

16  BY MR. TYLER:

17     Q.  What I'm trying to understand, was there a
18  point where they ever said we can't treat you without
19  insurance, period, or was it more of --

20     A.  No, they didn't say -- no, they didn't say we
21  can't treat you, period.

22     Q.  Okay.  But they did say if we treat you
23  without insurance, it might be expensive?

24     A.  They did say that later on, I think.

25     Q.  So at that point I'm assuming you're going to

Page 37

1  try to -- or the stepdad and Shalynne want to try to
2  see if they can get her on insurance so they don't
3  have to lay out a bunch of money to get treatment?
4     A.  Well, so she can get the right treatment,
5  yeah.
6     Q.  Okay.  So they tell you to wait or you guys
7  asked to wait while you try to get insurance; do you
8  know which way it went forward?
9     A.  We had to wait.  We just -- we sat and waited
10  because by the time they called us back there, it was
11  like we'd already been sitting there for like over an
12  hour.
13     Q.  And so at the point where they tell you to go
14  sit, did they say, you know, we've got some priorities
15  in front of you or people that are waiting in front of
16  you, we'll call you when we're ready or how did that
17  work?
18     A.  I didn't go up -- I didn't go up there with
19  Shalynne.  Shalynne went up there, and I think
20  Shalynne and her stepdad went up there, and then they
21  came back.  I didn't hear exactly what they were
22  saying about the wait.  They just said, well, they
23  just told us that we're going to have to wait.
24     Q.  Was it your impression that they were waiting
25  to be called to be treated, though?

Page 38

1     A.  Yes.
2     Q.  Okay.  And at that point it was the
3  understanding of all of you that she was going to be
4  treated, you were just waiting for that to occur?
5     A.  Um-hum.
6     Q.  Is that a yes?
7     A.  Yes, sorry.
8     Q.  And then you said you waited a period of time
9  until somebody called her.  During that period of time
10  what happened?
11     A.  We sat there.  She was complaining about her
12  knee and her lower leg and, you know, that was -- and
13  she was saying that she -- that she probably going
14  to need an MRI.
15     Q.  Do you recall any specific complaints
16  regarding the knee and lower leg?
17     A.  They was just really hurting and they was
18  starting to get swollen and they had like some redness
19  on it, but just complaining about, you know, the pain
20  and how swollen it was.
21     Q.  Did she provide specific indication of where
22  her leg was hurting?  Did she point or anything like
23  that?
24     A.  Yeah.
25     Q.  Where did she point?

Page 39

1     A.  She pointed to like -- not like the ball,
2  like how do I -- probably like -- do you want me to go
3  like this?  Like about, like around this area.
4     Q.  And --
5     A.  And like through here.
6     Q.  And for the record, you're pointing to
7  approximately one inch directly below the kneecap?
8     A.  Yeah, like around -- it was just like --
9  it was like right through here was hurting, she told
10  me.
11     Q.  Okay.  And so just so we're clear on what
12  you're doing, you're at about the kneecap and to one
13  inch below that, and then you're kind of going around
14  to the sides of the knee, but it's on kind of the
15  front portion of the knee?
16     A.  Yeah.
17     Q.  Okay.
18        MR. GISH:  Counsel, I think he was also
19  gesturing sort of towards the back as well.
20  BY MR. TYLER:
21     Q.  Well, I want to make clear what you were
22  doing.  When I was watching you, you were going like
23  this, correct?
24     A.  Well, I went like, yeah, like about right
25  here.

Page 40

1     Q.  Okay.  And so where your hand's going right
2  now is about --
3     A.  Is like right here.
4     Q.  -- it's about halfway?
5     A.  Yeah, somewhere around there, yeah.
6     Q.  Okay.  So it would be the front half of the
7  area directly below the knee?
8     A.  Yeah.  I'm guessing, yeah.
9     Q.  And when I say front half, what I mean is the
10  top portion, where your kneecap actually is, about
11  halfway around the calf?
12     A.  Wait, I can't see.  Do it again.
13     Q.  That's what you were doing, so it doesn't
14  really matter what I'm doing.
15     A.  Yeah.
16     Q.  Okay.
17     A.  I was just making sure you were doing it
18  right.
19     Q.  Okay.  So it was -- and just so we're a
20  hundred percent clear, it was the front half of the
21  leg, from the kneecap to about one inch below?
22     A.  Yeah.
23     Q.  Okay.  Okay, and you said she had
24  mentioned -- was it Shalynne that mentioned an MRI?
25     A.  Yes.

LELAND J. NELSON                                               July 09, 2018
VILELA vs VALLEY HEALTH SYSTEM                                 41—44

Page 41

1    Q.   And do you have any idea why she thought an
2  MRI was indicated?
3    A.   Because it was going -- it probably was going
4  to show that there was something that was going to be
5  wrong -- that there's something wrong with her that's
6  going to like -- like probably like musclewise or
7  something like that, compared to an x-ray that's not
8  going to -- that wasn't going to show anything.
9    Q.   Would I be correct in assuming you don't know
10 a lot about the difference between an x-ray, CT and
11 MRI?
12   A.   I don't, no.
13   Q.   Okay.  Was it your impression just this was
14 because of her CNA training she thought this made
15 sense or --
16   A.   Yes.
17   Q.   Okay.  As far as what study was appropriate
18 to examine her knee, you didn't have an opinion one
19 way or the other?
20   A.   No.
21   Q.   Okay.  And as far as why she thought an MRI
22 made sense, you didn't really know why, it's just what
23 she stated, or you had an understanding?
24   A.   Yeah, I didn't -- I mean, she tried to
25 explain it, but . . .

Page 42

1    Q.   You had mentioned swelling.  Was the swelling
2  in that same knee area you described?
3    A.   Yes.
4    Q.   Okay.
5    A.   It was all over.
6    Q.   When I say the same area, I'm talking about
7  that one inch for the front half of the calf.
8    A.   I mean, like all of it was pretty much
9  swollen.
10   Q.   When you say all of it, I need to understand
11 what that means.
12   A.   Okay, like, like, I mean, because like her
13 knee was swollen, like everything like from like, like
14 it was like all was swelling, so . . .
15   Q.   Okay.  But it was the knee area?
16   A.   The knee, lower leg, all that, it was just
17 swollen.  It was just swollen, like it was because she
18 hit it, so it all like got big.  Compared to the other
19 one --
20   Q.   Okay.
21   A.   -- it was big, so just everything was
22 swollen.
23   Q.   And just so we're clear, if you recall, was
24 the swelling from the toes all the way up to the thigh
25 or --

Page 43

1    A.   No, it wasn't the toes.  It was just like --
2  it was just like -- it was just like, like this area
3  was like all swollen.
4    Q.   Okay.  And you were gesturing kind of
5  generally to the knee area?
6    A.   The knee and lower leg, yeah.
7    Q.   Okay.
8    A.   Not like lower lower, but like right like
9  around the calf area still was like still swollen.
10   Q.   Okay.  So would it be fair to say kind of
11 upper calf through the knee area?
12   A.   Yeah.
13   Q.   Okay.  I'm assuming since you could see this,
14 she had shorts on or --
15   A.   Yeah.
16   Q.   Okay.  Did it appear discolored or anything
17 like that?
18   A.   Yeah, I mean, it was red.
19   Q.   Same area?
20   A.   Uh-huh.
21   Q.   Anything else you recall observing regarding
22 her leg and lower extremity?
23   A.   Just that it was swollen.
24   Q.   Any other interaction with any employees of
25 the facility prior to being called back?

Page 44

1    A.   No.
2    Q.   Okay.  Do you recall any other discussions on
3  the phone during that time frame?
4    A.   That she called her mom, that was it.
5    Q.   Do you recall that conversation at all?
6    A.   No.
7    Q.   Did the three of you stay together that whole
8  time?
9    A.   Yes.
10   Q.   When somebody comes out and calls her name,
11 was that somebody from the facility?
12   A.   Yeah.
13   Q.   Okay.  And they're going to take her back
14 into the actual treatment area of the ER?
15   A.   Yeah, they took her back to the x-ray room.
16   Q.   Okay.  Did you accompany her?
17   A.   Yes.
18   Q.   Did the stepdad?
19   A.   No.
20   Q.   Okay.  The person who initially grabs you out
21 of the waiting area to bring you back, do you know if
22 that was a nurse or some administrative person?
23   A.   I guessed it was a nurse.
24   Q.   Okay.  Do you recall what she looked like at
25 all?  I'm assuming it's a woman.

LELAND J. NELSON
VILELA vs VALLEY HEALTH SYSTEM

July 09, 2018

45–48

Page 45

1   A.  Yeah, it was a woman.  I think she was white.

2   Q.  Anything else as far as age, hair color or

3  anything like that?

4   A.  I want to say she was older, but I don't

5  remember the hair color.

6   Q.  I'm assuming you don't remember the name

7  then?

8   A.  No.

9   Q.  Okay.  Does she have any discussion with

10  Shalynne about what's going on with her or you just

11  walk straight to the x-ray room?

12   A.  She asked, you know, what the problem -- like

13  she just told her, you know, that we're going to give

14  you an x-ray and we want to see -- like I guess she

15  said it was -- she said she heard it was like

16  something with her knee and she was going to give her

17  a x-ray.

18   Q.  So I'm assuming this conversation is not

19  happening in the waiting room, you --

20   A.  No, it was going toward the -- we're going

21  toward the x-ray room.

22   Q.  Okay.  Do you go to a little triage area to

23  talk about this first or is this all just during the

24  walk to the x-ray?

25   A.  All during the walk.

Page 46

1   Q.  And what do you recall Shalynne telling her

2  about what's going on during that walk?

3   A.  That she said that you're probably not going

4  to find anything with the x-ray, it's not going to

5  help, and that's all I can remember.

6   Q.  Okay.  Was Shalynne able to walk on her own?

7   A.  No, she's still in the wheelchair.

8   Q.  Okay.  Had she been in a wheelchair that

9  whole time in the waiting area?

10   A.  Yes.

11   Q.  Okay.  Was that wheelchair provided to her at

12  the time you began filling out the paperwork?

13   A.  Yes.

14   Q.  Okay.  Were you able to get that wheelchair

15  basically as soon as you got there and explained there

16  was a knee problem?

17   A.  Yes.

18   Q.  Okay.  And do you have any recollection of

19  what Shalynne told this person we're assuming to be a

20  nurse during the walk to the x-ray room?

21   A.  Just that she thinks the x-ray won't help.

22   Q.  And then when you get to the x-ray room, they

23  put Shalynne on the table?

24   A.  Um-hum.

25   Q.  And then I'm assuming --

Page 47

1       MR. GISH:  Is that a yes?

2       THE DEPONENT:  Oh, yes.

3  BY MR. TYLER:

4   Q.  And then you and the nurse step out of the

5  room?

6   A.  Yes.

7   Q.  Pretty quick process, I'm assuming?

8   A.  Yes.

9   Q.  Okay.  And then what happens after that

10  x-ray?

11   A.  They put us in -- what's it called -- in the

12  little wait -- the little rooms.

13   Q.  Like where the beds are with the curtains

14  that go around?

15   A.  Yeah, just like with a -- like with a -- it

16  just had like a little bed and then there was a

17  curtain and there was like two chairs to sit down.

18   Q.  Okay.  So you're in the actual ER treatment

19  area.  While they're waiting for the x-ray results,

20  they put you in one of those little treatment areas

21  where there's a bed that Shalynne can lay on and

22  there's two chairs and a curtain that goes around?

23   A.  Yeah.

24   Q.  Okay.  No point during this discussion did

25  anybody say, well, we're not going to do an x-ray,

Page 48

1  we're not going to look at your knee because you don't

2  have insurance?

3   A.  Say that one more time.

4   Q.  At no point during this treatment does this

5  nurse ever say that we're not going to treat you

6  because you don't have insurance?

7   A.  I can't remember.  Like the nurse that called

8  us back, right, you're talking about that nurse?

9   Q.  Yeah.

10   A.  I can't remember.

11   Q.  I mean, obviously she's given her an x-ray

12  and put her in that treatment area.  Was there ever

13  any discussion that I shouldn't be doing this because

14  you don't have insurance?  Was there every anything

15  where she said --

16   A.  She didn't say I shouldn't do this because

17  you don't have insurance.  I just don't remember the

18  whole conversation.

19   Q.  Fair to say it was your impression that she

20  was providing treatment to Shalynne during this time

21  frame?

22   A.  Yeah, she was doing what she was told to do.

23   Q.  While you're in that waiting area, eventually

24  she's seen by a PA; do you recall that?  It's a woman

25  PA?

LELAND J. NELSON                                    July 09, 2018
VILELA vs VALLEY HEALTH SYSTEM                      49–52

Page 49

1    A.  Yeah.
2    Q.  Okay.  Is the next interaction after the
3  x-ray and being put in that waiting area within the ER
4  treatment section with the nurse or with the PA?
5    A.  While we was waiting?  It was just us in the
6  room and then the PA came in, I believe.
7    Q.  Okay.  So after you walked back for x-ray and
8  you're waiting in the treatment area, the next person
9  you talk to is the PA?
10    A.  Yeah, because she just said just wait here,
11  we'll get the doctor or something like that over here.
12    Q.  Okay.  So the nurse that had told you to wait
13  there said I'm going to go get the doctor?  Is that a
14  yes?
15    A.  Yes, sorry.
16    Q.  How long do you remember that taking?
17    A.  For the doctor to come?  Maybe 30 minutes.
18    Q.  At that point, any change in condition or
19  does her leg pretty much look the same as it had when
20  you went back?
21    A.  It looks the same.  It still hurts.  The
22  leg -- the leg, the lower leg and the knee still hurts
23  and it's still red and swollen.
24    Q.  When the PA arrives -- and I understand you
25  probably weren't sure if it was a PA or a doctor, is

Page 50

1  that --
2    A.  Yeah, I wasn't sure.
3    Q.  Okay.  So when the new medical provider
4  arrives that you assumed was a doctor --
5    A.  Um-hum.
6    Q.  Is that a yes?
7    A.  Yes.
8    Q.  Okay.
9    A.  Sorry.
10    Q.  Describe for me that interaction, please.
11    A.  She just said -- she pretty much said, you
12  know, yeah, the x-rays shows that nothing's wrong.
13  And that's when Shalynne was like -- Shalynne told
14  them, you know, I need something -- I need something
15  more than an x-ray.
16       And then she -- and I remember she saying,
17  the doctor or PA, I remember her saying, well, we
18  can't really -- we can't do nothing really with it
19  because you don't have insurance.  You have to get --
20  you have to get insurance and go see a specialist to
21  get your knee looked at, to get your knee and stuff
22  looked at.
23       And also Shalynne told them -- Shalynne also
24  told them, you know, yeah, it hurts like on my knee
25  and leg area and it's red, and that's when she told

Page 51

1  her, yeah, go see a specialist, get insurance and go
2  see a specialist.
3    Q.  Okay.  PA arrives, tells her the x-ray is
4  negative.  I'm assuming she looks at the leg?
5    A.  Yes.
6    Q.  Okay.  What do you recall of the examination?
7    A.  She like -- I remember she was -- she touched
8  her leg, she asked like, and then of course Shalynne
9  winced in pain, and I remember she touching it and
10  saying, oh, yeah, it's swollen, and that was about it.
11    Q.  Do you have any recollection of what area of
12  the leg caused her to wince in pain?
13    A.  Like when she touched like around here, it
14  was like she touched her first and she winced and she
15  touched here and winced.  She touched the knee, of
16  course, and she winced.  Like she touched like pretty
17  much everything that was like all through here, it was
18  all -- she was like, and she was wincing through the
19  pain.
20    Q.  Okay.
21    A.  Like through all that.
22    Q.  So again, you were kind of doing the kneecap
23  itself and in that area approximately one inch below
24  the kneecap and then the front half of the leg?
25    A.  Yeah.

Page 52

1    Q.  Okay.  And was there a discussion about
2  whether or not it was primarily a knee issue or
3  whether -- or about the history with the knee
4  problems?
5    A.  Didn't ask about -- didn't really get asked
6  about it.
7    Q.  Okay.  What do you recall of the discussion
8  the PA had with Shalynne?
9    A.  Just, you know, that her knee -- that, you
10  know, that there was the whole insurance thing and
11  then that she was swollen and that-- that's all I can
12  really remember about it.
13    Q.  So does she examine the leg first or talk
14  about the x-ray first?
15    A.  She talked about the x-ray and then she
16  examined the leg and then that's when she went on to
17  say that, you know, that you might need surgery on it,
18  but you need to go get insurance and see a specialist
19  first.
20    Q.  So the insurance discussion was with regard
21  to potential follow-up surgery regarding the knee
22  concerns?
23    A.  You mean like -- can you say that again?
24    Q.  Sure.  So when insurance first comes up, it's
25  the PA saying we looked at the x-ray, it was negative,

LELAND J. NELSON                                    July 09, 2018
VILELA vs VALLEY HEALTH SYSTEM                      53–56

Page 53

1   I've examined your leg, it looks like you might need
2   surgery, but in order to have surgery completed, you
3   need to go see a specialist and you need to get
4   insurance; was that how it unfolded?  I'm just trying
5   to understand.
6       A.  Yeah.
7       Q.  Okay.
8       A.  I think she -- like the specialist is
9   supposed to do surgery or something like that, not
10  them.
11      Q.  Okay.  So the issue with the insurance and
12  need to see a specialist was with regard to potential
13  surgery?
14      A.  Well, the way I understood it was that it
15  seemed like the specialist was going to do the surgery
16  or something like that.
17      Q.  Any other recollection of that interaction
18  with the PA?
19      A.  No, just pretty much what I told you.  She
20  just told us to sit here and wait.
21      Q.  So other than, you know, we can't do a
22  surgery here in the ER, you're going to need to follow
23  up with a specialist on that, was there any other care
24  that they said that they wouldn't or couldn't provide?
25      A.  They just said they couldn't -- they couldn't

Page 54

1   do no more, nothing else about it, and then they just
2   gave her a brace and some crutches and said -- and
3   then just let us go.
4       Q.  And what I'm trying to make sure I'm clear on
5   is, there was nothing else that, you know, Shalynne
6   said I need this or I want this or, you know, you
7   haven't asked me about this and they said we can't
8   treat you, we won't treat you, other than the surgery?
9       A.  Just the MRI.  She just said she wanted an
10  MRI and they said that she couldn't -- that they
11  couldn't give it to her.
12      Q.  So anything besides the MRI and the fact that
13  they couldn't do surgery?
14      A.  That's all I can remember, was that it was --
15  that they wouldn't give her an MRI.
16      Q.  Did you get the impression that the PA
17  actually took her time and examined the knee?
18      A.  I don't feel like she did because it was --
19  because she wasn't there that long.  You know, like
20  she was just like, she was there, she just talked and
21  then just -- and then she left and we didn't see her
22  again and then . . .
23      Q.  What about it made you feel that she didn't,
24  just the duration of the time with you?
25      A.  The duration, it's like it wasn't -- I guess

Page 55

1   I just felt like it should have been like, like more
2   and like she should like -- I felt like she should
3   have did more, I don't know what, but I felt like she
4   should have did more other than just say, oh, well,
5   she looked at it, oh, yeah, you might need surgery,
6   you need insurance, go to a specialist, and that was
7   it.
8       Q.  Okay.  And to make sure we're clear --
9       A.  And --
10      Q.  -- you know for sure she looked at the x-ray?
11      A.  Um-hum.
12      Q.  And she explained the x-ray?
13      A.  Um-hum.
14      Q.  Those are yes?
15      A.  Yes, yes, sorry, yes, yes.
16      Q.  And she actually physically examined her
17  knee?
18      A.  Yes.
19      Q.  And she asked Shalynne about her knee?
20      A.  Yes, like where it was -- like if it was
21  hurting, yes.
22      Q.  Okay.  What else did you feel should have
23  been done during the exam that wasn't?
24      A.  I just feel like -- like I say, I don't know
25  the whole procedure, but like I say, she asked for an

Page 56

1   MRI, like I feel like she should have got the MRI, you
2   know, and I'm not -- like I say, I'm not
3   professionally whatever, but like they should have
4   like -- if they saw like the knee was red, it's like I
5   don't know, just like, like do more tests on it.  They
6   should have did more tests, I feel like, other than
7   just an x-ray.
8       Q.  Do you feel the PA was answering Shalynne's
9   questions?
10      A.  Yeah, she answered them.
11      Q.  Anybody else present during those
12  interactions with the PA other than you and Shalynne
13  and the PA herself?
14      A.  I want to say her brother was in there, in
15  the room.
16      Q.  Shalynne's brother?
17      A.  I want to say yes.
18      Q.  Who is that?
19      A.  Josiah.
20      Q.  What point did Josiah arrive?
21      A.  About maybe like five, ten minutes after we
22  was in the room; maybe ten minutes after the room.
23      Q.  So while you're in the ER treatment area,
24  after the x-ray but waiting for the PA, he arrived?
25      A.  Um-hum.

LELAND J. NELSON
VILELA vs VALLEY HEALTH SYSTEM

July 09, 2018

57—60

Page 57

1    Q.  Okay.  How old is Josiah?
2    A.  How old is he?
3    Q.  Yeah.
4    A.  At that time?
5    Q.  Yeah.  I mean, is this a kid or an adult?
6    A.  He's an adult, yeah.
7    Q.  Anybody else present?
8    A.  I want to say -- I can't remember if the
9    stepdad was in there or not, but I do remember Josiah
10   being in there and me.
11   Q.  Do you recall discussions that the PA had
12   with you about, you know, if the pain continues, if it
13   worsens, if you see additional swelling, things like
14   that, you need to follow up and get additional medical
15   treatment?
16   A.  No.
17   Q.  You had started to mention the brace and
18   things like that.  I'm assuming there was some
19   conversation like that with the PA?
20   A.  No, not with the PA.  Another doctor -- like
21   a nurse came in with it.
22   Q.  Okay.  So is that the extent of the
23   conversation with the PA that you can recall?
24   A.  Yes.
25   Q.  Okay.  Do you recall any discussion about

Page 58

1    whether you wanted to see an ER physician as well as
2    the PA?
3    A.  Say that one more time.
4    Q.  Sure.  Do you recall if there was any
5    discussion about also having a physician come in as
6    well as the PA to examine the patient?
7    A.  In the hospital?  No.
8    Q.  Anything else during that interaction with
9    the PA we haven't talked about?
10   A.  No.
11   Q.  Okay.  PA leaves, and then the three of you,
12   meaning you, Shalynne and Josiah, are waiting awhile
13   and then a nurse comes back?
14   A.  Yes.
15   Q.  Okay.  How long are you waiting there?
16   A.  Maybe like another 15, 20 minutes.
17   Q.  And was this the same nurse that walked you
18   to x-ray?
19   A.  No.
20   Q.  Okay.  What do you remember of this nurse?
21   A.  It was a guy, and he was kind of heavyset,
22   and he was white.
23   Q.  Do you remember age or anything like that?
24   A.  No.
25   Q.  Okay.  And what did that interaction entail?

Page 59

1    A.  He just had the brace.  He said we was going
2    to give you this brace and these crutches.  And he
3    just showed Shalynne how to put it on and he adjusted
4    the crutches and then sent us on our way.
5    Q.  Showed her how to use the brace and then
6    adjusted the crutches?
7    A.  Yeah, like showed us how -- like how to put
8    it on.
9    Q.  Anything else you recall during that
10   interaction?
11   A.  She just was like -- you know, she was like,
12   oh, is that it, like no -- there's not going to be any
13   tests or nothing?  And he said no, we're just going to
14   give you the brace and the crutches.
15   Q.  At that point you guys leave?
16   A.  Yeah, like after she gets all that, yeah,
17   just walked us out and she signs out and whatever she
18   has to do and then we put her in the car.
19   Q.  So other than the interaction with the nurse
20   that walks you back to x-ray, the interaction with the
21   PA, and then this third gentleman that comes in, shows
22   you how to use the brace and adjusts the crutches, any
23   other interactions with medical providers?
24   A.  No.
25   Q.  Shalynne's knee still look the same at this

Page 60

1    point?
2    A.  Yes.
3    Q.  Okay.  When she leaves, she actually has the
4    brace on, she's using the crutches?
5    A.  Um-hum, yes.
6    Q.  I'm going to show you what's Bates stamped
7    CHH 11.  This is part of the medical records and these
8    would be --
9         MR. GISH:  Which one was it, 11?
10        MR. TYLER:  11.
11   BY MR. TYLER:
12   Q.  So these are discharge instructions provided
13   to Shalynne, and you see it discusses the knee area,
14   and I'm showing you toward the bottom of that page it
15   says get prompt medical attention if one of the
16   following occurs, pain or swelling increases over the
17   knee or calf or shortness of breath or chest pain; do
18   you see where I'm at?
19   A.  Yeah.
20   Q.  Do you recall Shalynne being provided this
21   document?
22   A.  I don't.  I don't recall it.
23   Q.  Okay.  Do you recall ever seeing this
24   document before today?
25   A.  No.

LELAND J. NELSON
VILELA vs VALLEY HEALTH SYSTEM

July 09, 2018
61—64

Page 61

1    Q.  Do you recall if she was provided some
2    documents when she was discharged from the ER?
3    A.  Not that I can recall.
4    Q.  Okay.  Is it your position that she never
5    received a packet of information or just you don't
6    remember?
7    A.  I don't remember.
8    Q.  And then I'm showing you Bates stamp CHH 14,
9    and on this page it indicates patient education
10   materials provided, knee pain, meniscus injury
11   possible.  And then on the comments section it says
12   return for new or worsening; do you recall any
13   discussions to that effect with the medical staff?
14   A.  No.
15   Q.  Okay.  No, you don't recall, or no, you don't
16   think it happened?
17   A.  No, I don't recall them telling us to do
18   that.
19   Q.  Okay.  Is it possible that it occurred and
20   you don't remember or you don't think it happened,
21   period?
22   A.  I don't think it happened, period.
23   Q.  I'm showing you Bates stamp CHH 19.  It says
24   reason for exam, injury, knee and below, and then it
25   says radiology, injury, knee and below.

Page 62

1    My understanding of what you said about the
2    exam, the PA actually looked at the area both of the
3    knee itself as well as below that; would you agree
4    with that?
5    A.  Yes.
6    Q.  Okay.  You indicate in your affidavit that
7    Shalynne had informed the staff that she was on the
8    NuvaRing?
9    A.  Yes.
10   Q.  Do you remember that conversation?
11   A.  Yes.
12   Q.  Who did she inform of that?
13   A.  The person that was -- the person that was
14   getting the information.  I think it was the nurse
15   that was taking us to the x-ray, she asked her if she
16   was on any birth control.
17   Q.  What else do you recall her asking her?
18   A.  Like do you smoke, do you drink.
19   Q.  Kind of a laundry list of questions that you
20   would expect to be asked at the ER or --
21   A.  Yeah, like, you know, the basic questions.
22   Q.  Do you have any recollection of any other
23   specific questions other than birth control, smoking,
24   drinking?
25   A.  Well, allergies, you know, that's about --

Page 63

1    that's all I can remember.
2    Q.  Fair to say basically what you would expect a
3    nurse to ask you when you're going into the ER?
4    A.  Yeah, like basic questions.
5    Q.  Do you recall any discussions about her
6    ethnicity?
7    A.  No.
8    Q.  And again, is that something that you
9    specifically think didn't happen or you just can't
10   recall one way or the other?
11   A.  It didn't happen.
12   Q.  After you leave the ER, your affidavit
13   indicates over the next three weeks she continued to
14   complain of pain in the knee and lower leg.  She also
15   began to appear frequently short of breath.
16   Why don't you walk me through the progression
17   of that pain and the shortness of breath.
18   A.  Well, she was complaining every day about her
19   leg hurting and her knee and how it always hurts and
20   saying -- she was giving me pictures, texts.  She was,
21   you know, texting me pictures of it and saying how
22   much it hurts.  And I didn't notice the shortness of
23   breath until that last -- the last week we was
24   together.
25   Q.  As far as the knee pain, is that something

Page 64

1    that was a constant knee pain that didn't ebb or flow
2    or is that something that got worse with time or how
3    would you describe it?
4    A.  Well, it was -- it pretty much -- it like, it
5    got -- it was -- it like, it hurt, and then it was
6    like some days it hurt, some days it didn't, and other
7    days it hurt even more, and then toward the end it
8    started hurting more and more.
9    Q.  When you say towards the end, is that like
10   that week before she flew back to Missouri?
11   A.  Yeah.
12   Q.  And when you say it hurt more, like hurt more
13   than it did even when she first hurt it at the pool?
14   A.  It was about the -- I don't know if it hurt
15   more.  I just know that she just said like it's
16   hurting more than -- because at first like it felt
17   like it was getting better and then -- and then all of
18   a sudden like it started hurting even more and it
19   just, I don't know the level of the pain, but I do
20   know it was hurting more.
21   Q.  Okay.  Let me make sure I'm understanding
22   everything accurately.  It hurts off and on for a
23   little bit but seems like it's getting better for a
24   period of time?
25   A.  It seemed like it for a second, yeah.

Page 65

1    Q.   And eventually it starts hurting worse and
2  it's continuing to hurt?
3    A.   Um-hum.
4    Q.   Okay.  And that's more during that time frame
5  when you start to notice the shortness of breath?
6    A.   Yeah.
7    Q.   Okay.  So at this point where you've got
8  returned worsened pain and shortness of breath, were
9  there ever any discussions about additional medical
10  care?
11    A.   She just said she was going to -- like she
12  just got a job.  She was working on trying to get the
13  insurance so she can get it done.
14    Q.   Was there any discussion about returning to
15  the ER?
16    A.   She just -- well, she wanted -- she still
17  had -- she was trying to get the insurance so she can
18  see the specialist, not go to the ER.
19    Q.   I showed you that discharge instruction that
20  said with worsening pain or shortness of breath, to
21  return to the ER; was that ever a discussion at any
22  point?
23    A.   Um-um, no, sir.
24    Q.   Do you know if she ever attempted to schedule
25  a follow-up with a specialist?

Page 66

1    A.   She was -- she had -- she was going to once
2  she had her insurance.  She had just got the job --
3  she just got a job, so she was trying to work to get
4  that insurance so she can go see the specialist.
5    Q.   Beyond trying to get the insurance through
6  her job, do you have any idea of what actions were
7  being taken to try to get her covered?
8    A.   I'm not for sure about that.
9    Q.   Okay.  And fair to say then you don't know
10  when her insurance actually went into effect and could
11  have been used?
12    A.   Yeah, I'm not for sure about that.
13    Q.   As far as the appearance of the leg during
14  this time frame, would it have been the same swelling
15  and redness that whole time?
16    A.   The redness, it looked like it got -- it
17  looked like it got a little bit -- well, like a little
18  bit more like redder and then kind of like it was like
19  it might -- I just know it got redder.  I just know it
20  got redder.
21    Q.   Do you know if the swelling went down or
22  stayed the same, increased?
23    A.   It fluctuate from staying the same to
24  increasing and then it would go down to like how it
25  was and then -- but like it never looked normal.

Page 67

1    Q.   So the swelling would fluctuate from what it
2  was like when you left the ER to an increased amount
3  and go back and forth?
4    A.   Yeah, until like towards -- like I said, then
5  toward the end it just stood like, just stood big.
6    Q.   And that's during kind of that last week?
7    A.   Yeah, last week or so.
8    Q.   So that last week she had increased sustained
9  swelling, increased redness, shortness of breath and
10  increased pain?
11    A.   Yes.
12    Q.   Okay.  Anything else you can recall regarding
13  problems or observations with the knee and lower
14  extremity during that time period?
15    A.   Just that it just got worse.
16    Q.   At this point in time where her leg continues
17  to get worse, you've got the increased sustained
18  swelling, the redness, the increased pain, did you
19  express any concern or tell her that she needs to see
20  a doctor?
21    A.   Well, yeah, I was just like, you know, do you
22  need -- or I was -- I was just like you need to go, I
23  was like you need, you know, to try to see a
24  specialist, and she kept saying I'm trying, I'm trying
25  to get my insurance and stuff like that, so --

Page 68

1    Q.   Did you have any concern with her traveling
2  with that leg in that condition?
3    A.   Well, no, because I thought it was just a leg
4  injury.  I didn't -- I didn't know the -- how extreme
5  it could be.
6    Q.   So at this point you still think it's just
7  her meniscus or her knee?
8    A.   Yeah, like her leg, knee.
9    Q.   Do you recall, you know, her mom or stepdad
10  or anybody nagging her, you really need to go get that
11  checked out, anything like that?
12    A.   Not that I know of.
13    Q.   Is she limited in her ability to ambulate?
14  Ambulate just means walk.
15    A.   Oh, like if we was going somewhere, like I
16  had to like help her -- I had to help her walk for a
17  little -- like if she wasn't using the crutches, like
18  she tried to not use the crutches for a little bit and
19  that didn't really work, but --
20    Q.   Was she using the knee immobilizer?
21    A.   Yes.
22    Q.   Did you feel like she was using it properly?
23    A.   Yeah, I felt so because -- I mean, she had it
24  on, so --
25    Q.   I mean, she knew how to put it on, take it

LELAND J. NELSON
VILELA vs VALLEY HEALTH SYSTEM

July 09, 2018
69–72

Page 69

1  off?
2     A.   Yeah, like she just knew how to put it on,
3  take it off, yeah.
4     Q.   Okay.
5     A.   And . . .
6     Q.   I'm going to show you -- we'll mark this as
7  Exhibit A, and these are text messages that have been
8  produced in this case and it's my understanding or
9  impression that they're between yourself and Shalynne;
10  is that accurate?
11     A.   Yes.
12     Q.   Why don't you look through all three pages
13  and make sure those are all between the two of you.
14     A.   Yes.
15     Q.   Do you still have the same phone that you had
16  when you exchanged these?
17     A.   No.
18     Q.   Okay.  Do you remember what your phone number
19  was at that time?
20     A.   The same number.
21     Q.   Okay.  What's that number?
22     A.   (317) 987-3959.
23     Q.   And what would your carrier have been?
24     A.   AT&T.
25     Q.   Just give me one second.

Page 70

1        Are you familiar with Shalynne's signature?
2     A.   No.
3     Q.   Okay.  If I showed you an electronic
4  signature, you wouldn't be able to tell one way or the
5  other?
6     A.   Yeah, I wouldn't be able to tell you.
7     Q.   Just saved us some time.
8        Okay, let's turn to these text messages.  So
9  the first one, when it says to Shalynne, that means
10  that -- are these the texts that you were sending to
11  her?
12     A.   Yes, I believe so.
13     Q.   So did these screen shots come off your
14  phone, is basically what I'm getting at?
15     A.   Yes.
16     Q.   Okay.  And this first one -- do they go in
17  chronological order, meaning Page 223 is the first one
18  and then they go down through 225?
19     A.   Well, you mean like does like it go one after
20  like that?
21     Q.   Yeah, so what I'm getting at, is this the
22  first one in the series or is this the first one?
23        MR. GISH:  He wants to know if they're in the
24  correct order.
25        THE DEPONENT:  Gotcha.

Page 71

1        MR. GISH:  Right?
2        THE DEPONENT:  Yeah.
3  BY MR. TYLER:
4     Q.   I'm just trying to understand, which of these
5  would have been the first text; would it have been the
6  one on the first page?
7     A.   Yeah, it would have been this one, yes.
8     Q.   Okay.  So we would go through these in order,
9  223, 224 and 225?
10     A.   Gotcha, yeah.
11     Q.   Okay.  So this first text, it's got a picture
12  of two legs; I'm assuming those are Shalynne's?
13     A.   Yes.
14     Q.   And it says, "You can see how swollen they
15  are and stop, it's not your fault," with an emoji
16  blowing a kiss.
17     A.   Um-hum.
18     Q.   That's a text from her to you?
19     A.   Yes.
20     Q.   Okay.  If you go on to the next page, there's
21  a text string that starts on Thursday, June 4th; you
22  see where I'm at?
23     A.   Oh, yes.
24     Q.   So can I assume that this prior text above
25  that was from June 3rd?

Page 72

1     A.   Yes.
2     Q.   Okay.  And that would have been the day you
3  guys went to the ER?
4     A.   No, actually, no, that -- yeah, no, that's
5  the 3rd, yeah, that would be the 3rd.
6     Q.   Okay.  So this first text we're seeing on
7  Bates stamp 223, this would have been something she
8  sent to you after you guys left the ER?
9     A.   Yes, imagine it is.
10     Q.   Okay.  My first question is, do you know what
11  the texts were before this on this text string from
12  that day?
13     A.   No.
14     Q.   Do you still have access to those texts?
15     A.   I have -- I know I put my phone -- I kept
16  that phone, but I don't know -- I gotta go find it.
17     Q.   Okay.  Do you know if you provided additional
18  texts other than these three pages to Mr. Gish?
19     A.   I don't think so.  I don't remember,
20  honestly.
21     Q.   So how did you decide that this was where you
22  were going to start the screen shots, for lack of a
23  better term?
24     A.   Because I think this is when she first
25  started showing me her leg.

LELAND J. NELSON
VILELA vs VALLEY HEALTH SYSTEM

July 09, 2018

73—76

Page 73

1   Q.  Okay.
2   A.  How her leg was looking.
3   Q.  Okay.  Did you think that the stuff before it
4   that day weren't important or what was the thought?
5   A.  Probably.  That's probably what it was,
6   probably didn't think it was that important.
7   Q.  Okay.  It does sound like, though, you can
8   get all of the texts from that day and provide those
9   to Mr. Gish?
10  A.  Yes, if I find the phone.
11  Q.  Okay.  I'd ask if you'd do that, if you can
12  find it.
13  A.  Okay.
14  Q.  When you say -- when she says it's not your
15  fault, am I correct in assuming you were blaming
16  yourself for hurting her knee?
17  A.  Yeah, because I dropped her.
18  Q.  And then it goes on on the next page,
19  it says, "damn that sucks sorry."  Is that you
20  responding to that actual text on the page before?
21  A.  I can't remember.
22  Q.  Okay.  I'm just trying to understand if
23  there's any texts missing in the interim between these
24  two.
25  A.  I understand.  I don't -- I don't remember.

Page 74

1   I'm probably going to say there probably is because
2   she's showing me how swollen it is and I'm saying damn
3   that sucks sorry that it's so swollen, but I'm not a
4   hundred percent sure.
5   Q.  And when we're looking at this photo, we're
6   looking at the knee on the left side?
7   A.  Yes.
8   Q.  Okay.  So going on to her response, it says,
9   "Quit being sorry it's not your fault," laugh out
10  loud, or lol, but then it says, "But yeah I wish he
11  could just pick them up.  But idk" -- I don't know,
12  right -- "if they need to be there or not."
13      What is she talking about when she says "pick
14  them up" and "I don't know if they need to be there or
15  not"?
16  A.  I don't know.  I don't remember.
17  Q.  I mean, it seems like a non sequitur there.
18  I'm just trying to understand what she's referencing.
19  A.  Yeah, I don't remember.
20  Q.  Okay.  So I'm assuming after the ER, does she
21  go home to Amy's house?
22  A.  Yes.
23  Q.  And you go back to your place?
24  A.  I went to Amy's for a little bit and then I
25  went back to my place.

Page 75

1   Q.  Okay.
2   A.  Because I had to work the next day.
3   Q.  Okay.  So these texts would have been later
4   that evening?
5   A.  Yes.
6   Q.  Okay.  Next morning you check in, "How's your
7   leg," right, that's you?
8   A.  Yes.
9   Q.  She said she hadn't got any meds yet.
10      Was she provided a prescription when she left
11  the hospital?
12  A.  I do remember her having to get -- I see it
13  now, I do remember her having to get meds, but I'm
14  guessing, I think it was like supposed to be like pain
15  meds, but I think that's about it.  I think she was
16  just supposed to get pain meds.
17  Q.  Okay.  So it's your understanding she hadn't
18  filled the prescription that she was provided at the
19  ER; am I correct?
20  A.  That she hasn't --
21  Q.  She hasn't filled the prescription that she
22  was provided at the ER yet?
23  A.  Yes.
24  Q.  Okay.  And then you say, "Why not?"  And then
25  she says, "They never called and" -- and then it

Page 76

1   appears that the next page, that text is not finished.
2   A.  Um-hum.
3   Q.  Would you agree with me there?
4   A.  Yes.
5   Q.  Do you have any idea what that text said?
6   A.  No, I don't -- like I say, I don't remember.
7   Q.  We can agree, though, that the next entry
8   from Shalynne that says "like always lol" is not a
9   continuation of the text from the page before, though?
10  A.  No.
11  Q.  Okay.  So somewhere this is cut off, and that
12  should be somewhere on your phone, if you can find it?
13  A.  Yes.
14  Q.  Okay.  Any recollection at all what she said
15  there?
16  A.  No, just -- no, not really, that's all.
17  Q.  Any idea either if you did provide that to
18  Mr. Gish's office or, if you didn't, why you didn't
19  provide that rest of that text?
20  A.  I don't know, maybe -- maybe there was some
21  personal stuff on there I didn't -- wasn't important
22  for the case.
23  Q.  Okay.
24  A.  But I don't know for sure.
25  Q.  Do you think that you provided everything in

Page 77

1   this text stream or do you think that you kind of
2   picked and chose --
3       A.  I provided everything that was -- that was
4   for the case.
5       Q.  Okay.  And what I'm getting at is, would it
6   have been you not providing everything there or would
7   you have provided everything there for sure, you're
8   just not sure that the attorney would have produced?
9       A.  I would have provided everything that was
10  about the -- that was going to be about the case.
11      Q.  Okay.  I ask you again, if you can find that,
12  if you could provide that to Mr. Gish.
13      A.  Okay.
14      Q.  So on the next, the final page, 225, Shalynne
15  says, "Like always lol."  Do you know what she's
16  referencing there?
17      A.  Probably something I said to her personally.
18      Q.  Okay.  And then she says, "nothing I can say
19  so go on and believe what you want, bottom line it's
20  both of us."
21          Do you know what she's referencing there?
22      A.  Probably that about my -- about me dropping
23  her.
24      Q.  Okay.
25      A.  That's the only thing I could think of it

Page 78

1   would be.
2       Q.  Okay.  And then it's your understanding she's
3   -- it looks like she's filling her prescription; is
4   that what that reference is about having my meds
5   ready?
6       A.  Yeah, I'm guessing, yeah.
7       Q.  Okay.  Do you know if there's any other texts
8   that occurred after this about the condition of her
9   knee or photos of her knee?
10      A.  I don't know.
11      Q.  Okay.  Is that something you could look for
12  as well?
13      A.  Yeah.
14      Q.  Did you guys communicate about what's going
15  on with her knee on any other social media, like
16  Instagram or Twitter?
17      A.  No, just texting.  No, just texting.
18      Q.  Okay.
19      A.  That was it.
20          MR. TYLER:  All right, I'll pass the witness.
21  Thank you.
22              EXAMINATION
23  BY MR. WEISS:
24      Q.  Good morning.  My name is Todd Weiss, with
25  John Cotton & Associates.  I represent Tanya Netz and

Page 79

1   her employer in this, EmCare.
2          MR. GISH:  Counsel, can we just go off the
3   record for a second?
4          MR. WEISS:  Yeah.
5          (Discussion off the record.)
6   BY MR. WEISS:
7       Q.  Did you and Miss Ramos ever live together?
8       A.  No.
9       Q.  And you didn't go back to Missouri with her
10  when she left here, correct?
11      A.  No.
12      Q.  Okay.  So were you ever present at the
13  hospital when she was in Missouri?
14      A.  No.
15      Q.  Okay.  Who notified you of her passing?
16      A.  Her mom -- wait, of her passing?
17      Q.  Yeah, or her dying.
18      A.  Her friend called me to tell me that she
19  died.
20      Q.  Do you know which friend it was?
21      A.  Kaylyn.
22      Q.  It was Kaylyn?  Okay.
23          Do you know when that call was?
24      A.  It was in the morning, because I was at work.
25      Q.  So at the hospital on May 3rd, was Miss Ramos

Page 80

1   ever asked about what medications she was taking?
2       A.  She just told them that she was taking --
3   that she was on like birth control, I think.
4       Q.  So did they ask specifically are you taking
5   birth control or did they ask her which medications
6   she was taking?
7       A.  I'm not a hundred percent sure, but probably
8   what medicine is she taking.
9       Q.  Okay.  And she responded she was taking birth
10  control?
11      A.  Yes.
12      Q.  Okay.  Did she ever communicate about her
13  previous knee injury to the medical staff?
14      A.  Yes.
15      Q.  Do you remember exactly what she told her --
16  told them?
17      A.  That she -- that she -- that she hurt her
18  knee in either December or January, I can't remember
19  when it was, but she hurt -- she bust the same knee.
20      Q.  Okay, so at some point while she was there,
21  you -- or I guess she would have -- she told the
22  medical providers that I was dropped on the same knee
23  that I had previously injured?
24      A.  Yes.
25      Q.  Okay.  Prior to the hospital visit on

LELAND J. NELSON                                    July 09, 2018
VILELA vs VALLEY HEALTH SYSTEM                      81–84

Page 81

1  May 3rd, you said she had knee pain.  Was there any
2  swelling that you observed?
3     A.  Yes.  When she was at the hospital?
4     Q.  No, prior to the hospital.
5     A.  Oh, prior to the hospital.  There was when
6  she first got there because of the driving.
7     Q.  Okay.
8     A.  But after that, it went down.
9     Q.  So when you say went down, did it return to
10 normal or was it just less swollen?
11    A.  It was less swollen.
12    Q.  Okay.  But was it ever -- was the leg ever
13 not swollen prior to the hospital visit?
14    A.  Like the leg, the leg wasn't swollen, but the
15 knee, like the knee area was like, like it was like a
16 little, it wasn't --
17    Q.  Okay, so the knee was a little swollen?
18    A.  The knee was going down, like it was starting
19 to go down.  You could tell it was starting to go
20 down.
21    Q.  And that was -- that's in the knee, though,
22 correct?
23    A.  Yeah.
24    Q.  The leg above it or below it, that wasn't
25 swollen?

Page 82

1     A.  It was pretty much back to normal, too.
2     Q.  Okay.  When Miss Ramos was asking for the
3  MRI, did they ever say that they could -- that the
4  medical providers at the hospital, did they ever say
5  that they would only give her an MRI if she had
6  insurance?
7     A.  Yes.
8     Q.  Okay.  So they said if you had insurance, we
9  could give you an MRI?
10    A.  Well, not in them exact words, but they was
11 like, well, like you don't have insurance, like you
12 pretty much don't have insurance for -- to get an MRI
13 kind of pretty much.
14    Q.  Okay.  Okay.  Did they ever ask her about any
15 past surgical procedures that she had undergone?
16    A.  Not that I can remember.
17    Q.  Did they ask her if she had any chronic --
18 that means long term -- you know, medical situations?
19    A.  Not that I can remember.
20    Q.  Okay.  And I believe you already testified
21 there was no conversations about Miss Ramos'
22 ethnicity, correct?
23    A.  Yes.
24    Q.  All right.
25    A.  No conversation about that.

Page 83

1     Q.  Have you ever had a chance to review the
2  medical records from the visit on May 3rd?
3     A.  Other than just now, no.
4     Q.  Okay.  Before today?
5     A.  Yeah, before today, none.
6     Q.  Okay.  You said that she was wearing the knee
7  immobilizer after the hospitalization.  Do you know
8  how long she would wear it or how often?
9     A.  No, I don't know.  I know she wore it, and
10 then when it got uncomfortable, she took it off for a
11 little bit and then put it back on, but it wasn't --
12 like she didn't like go everywhere without it or
13 nothing like that.
14    Q.  Do you know if she was sleeping with it on?
15    A.  I don't -- well, she did sometimes.
16 Sometimes yes, and then like if it was bugging her
17 throughout the night, she would take it off, of
18 course.
19    Q.  Okay.  Okay.  Are you -- have you ever worn a
20 knee immobilizer?
21    A.  No.
22    Q.  Is that something you're familiar with?
23    A.  No.
24    Q.  Okay.  There was a note in your affidavit
25 about improper pressure from the knee immobilizer.

Page 84

1  What was the -- what's the basis for that statement?
2     A.  Like why was it improper --
3     Q.  Yeah, I mean, what makes you think there was
4  improper pressure applied by the knee immobilizer?
5     A.  Well, I mean, I guess it's supposed to
6  like -- like because I know she had like a lot of
7  discomfort with it.
8     Q.  Okay.
9     A.  And I know there was discomfort and probably
10 didn't -- I don't know if it was doing what it was
11 supposed to do.
12    Q.  Okay.  Do you know how long knee immobilizers
13 are supposed to be worn or how often?
14    A.  No.
15    Q.  Okay.  Did they -- did the providers on
16 May 3rd, did they specifically tell Miss Ramos if you
17 get insurance, you can come back and we'll do the
18 surgery here or did they say you need to go see a
19 specialist?
20    A.  No, they said you need to go see a
21 specialist.
22    Q.  Okay.  They never said go get insurance and
23 come back here and we'll do the surgery?
24    A.  No, they never said that.
25    Q.  Okay.  Did Miss Ramos ever mention to the

LELAND J. NELSON                                      July 09, 2018
VILELA vs VALLEY HEALTH SYSTEM                        85–88

Page 85

1   medical providers that she had, you know, fairly
2   recently driven from Missouri to Las Vegas; did the
3   trip that she took ever come up in the conversation
4   with the medical providers?
5       A.   Not that I can remember.
6       Q.   Okay.  Do you know if she had a Missouri or a
7   Nevada driver's license at that time?
8       A.   I don't remember.
9       Q.   Okay.  Did any of the medical providers on
10  May 3rd ever tell Miss Ramos that she shouldn't seek
11  any additional medical care until she got insurance?
12      A.   Say it one more time.
13      Q.   Did any of medical providers on May 3rd, did
14  they ever tell Miss Ramos you shouldn't go get medical
15  care from anybody else until you get insurance?
16      A.   I want to say yes, they did, they told her
17  that, because they said if she doesn't have insurance,
18  then she needs to go see a specialist after she gets
19  insurance.
20      Q.   Okay.  So they said don't go see a specialist
21  until after you get insurance?
22      A.   Yes.
23      Q.   Okay.  Did she ever communicate to any of the
24  medical providers that she was going to be getting on
25  a plane to go back to Missouri --

Page 86

1       A.   No.
2       Q.   -- within the next few weeks, anything like
3   that?
4       A.   No.
5       Q.   Did she ever mention she was going to go back
6   to Missouri at all?
7       A.   No.
8       Q.   Okay.  Does the name Tanya Netz, does that
9   ring a bell?
10      A.   No.
11      Q.   Would you recognize her if you saw her on the
12  street?
13      A.   Probably not.
14      Q.   Now, just to get this straight, the physical
15  exam that the PA did, did I hear that you said she
16  went above and then below the knee?
17      A.   She went around -- yeah, around the knee.
18      Q.   Okay, so just around the knee or any other
19  place on the leg?
20      A.   She just pretty much hit the knee.  She did a
21  little bit -- like she just touched where it was red
22  at.
23      Q.   She touched where it was red?
24      A.   Yeah.
25      Q.   Okay.  Did that include behind the back of

Page 87

1   the leg?
2       A.   I don't remember seeing her going behind the
3   leg, no.
4       Q.   If I heard you correctly, you testified that
5   you don't remember Miss Ramos being asked if she'd
6   want to see a physician in the emergency room?
7       A.   Yeah, that did not happen.
8       Q.   Did she specifically ask to see a doctor?
9       A.   I don't remember.
10      Q.   Okay.  Now, Miss Ramos, I mean, did she
11  complete the discharge process before leaving?  You
12  know, did they say, okay, now you're free to go or did
13  you guys just get up and go?
14      A.   They said we're free to --
15      MR. GISH:  Hold on.  Vague and ambiguous.
16      Go ahead.  Go ahead.
17      THE DEPONENT:  They said we're free to go.
18  BY MR. WEISS:
19      Q.   Okay.  So you waited until they said you're
20  free to go then?
21      A.   Yes.
22      MR. WEISS:  I believe that's all I have.
23  Thank you for your time, Leland.
24      MR. GISH:  I just have a couple of
25  follow-ups.

Page 88

1              EXAMINATION
2   BY MR. GISH:
3       Q.   On the day that you and Shalynne were in the
4   hospital, did she have the ability to sign documents?
5       A.   Yes.
6       Q.   So you saw her sign other forms -- or you saw
7   her signing forms that were given to her?
8       A.   She filled the forms when we first got in
9   there, yes.
10      Q.   Yes, all right.
11      And there's been quite a bit of testimony
12  about -- where counsel described the manner in which
13  you were gesturing to your leg, and it appeared to
14  me -- he said the front half of the leg is where your
15  hands were, and it appeared to me that you were
16  reaching back further than the front half of the knee.
17      A.   I was --
18      Q.   Is my observation correct?
19      MR. TYLER:  Object to form, asked and
20  answered, testimony speaks for itself.
21  BY MR. GISH:
22      Q.   Go ahead.
23      A.   Well, yeah, I had said -- I said like
24  probably like right -- like not the full front, but I
25  did like -- I was like right around this, like right

LELAND J. NELSON
VILELA vs VALLEY HEALTH SYSTEM

July 09, 2018
89–92

Page 89

1  around like the middle, like right here, then I went
2  like this.
3       Q.  See, he can't see -- he can't see your left
4  hand, what I'm seeing --
5       A.  Gotcha.
6       Q.  -- on my side.
7       A.  Okay.  So I went --
8       Q.  So show him again.
9       A.  Yeah, because I went like this.  I went like
10  around here.
11       Q.  And at least your ring finger and your pinky
12  seem to be going further back on the leg --
13       A.  Yeah.
14       Q.  -- than just the front half.
15       A.  Yeah.
16       Q.  Is my observation correct?
17       A.  Yes.
18       Q.  All right.
19          MR. GISH:  Thank you.  I don't have any
20  further questions.
21          MR. TYLER:  No questions.
22              FURTHER EXAMINATION
23  BY MR. WEISS:
24       Q.  One more thing, Leland.  How long -- how long
25  do you estimate the PA's exam was?

Page 90

1       A.  About probably like five minutes.
2       Q.  Are you pretty sure on that?
3       A.  About five, ten, yeah.
4       Q.  Five, ten?
5       A.  Between five, ten.  It wasn't no longer than
6  that.
7       Q.  Okay.
8          MR. WEISS:  And that's all I have.
9          MR. TYLER:  Okay, we're done.
10          MR. GISH:  Actually, I have a follow-up based
11  on that.
12              FURTHER EXAMINATION
13  BY MR. GISH:
14       Q.  Based upon what you observed during the PA's
15  exam, did she appear rushed?
16       A.  I mean, she just -- it didn't seem like she
17  was -- I guess, like it didn't seem like she was like
18  fully like, like worried, like, you know, like trying
19  to like really help.
20       Q.  So it didn't seem like she cared about what
21  Shalynne was complaining about?
22       A.  Yeah.
23          MR. TYLER:  Form.
24  BY MR. GISH:
25       Q.  Based on what you observed?

Page 91

1       A.  Yes.
2       Q.  And based upon her demeanor?
3       A.  Yes.
4       Q.  All right.
5          MR. GISH:  All right, thank you.  Nothing
6  further.
7          MR. TYLER:  So you have the opportunity to
8  review this and you can see if there's anything where
9  you misspoke or where you were misheard and you can
10  make those changes like we talked about, and we could
11  potentially comment on if it's a major substantive
12  change.
13          If you're comfortable with your testimony,
14  though, you can waive that and then you don't need to
15  do anything in follow-up, so it's up to you.
16          MR. GISH:  Well, do you mail them anymore?
17          THE COURT REPORTER:  Can we go off the
18  record?
19          (Discussion off the record.)
20          MR. TYLER:  Okay, we had a brief discussion
21  off the record about the logistics of the reviewing of
22  the transcript.  It was indicated to you that you
23  could review it at the court reporter's office for the
24  next 30 days or potentially through Mr. Gish's office
25  if he gets a copy.

Page 92

1          You're welcome to do that or you can still
2  waive if you don't want to do that.  It's up to you.
3          THE DEPONENT:  I'll do that.
4          MR. TYLER:  Okay.  That's it.
5          THE COURT REPORTER:  Okay, we're off the
6  record.
7          (Thereupon, the deposition concluded
8          at 11:55 a.m.)
9          (Exhibit A marked.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

LELAND J. NELSON

July 09, 2018

VILELA vs VALLEY HEALTH SYSTEM

93–96

Page 93

CERTIFICATE OF REPORTER

1
2  STATE OF NEVADA    )
           )  ss:
3  COUNTY OF CLARK    )
4        I, Gary F. Decoster, CCR 790, licensed by the
5  State of Nevada, do hereby certify:  That I reported
6  the deposition of LELAND JAMES NELSON, on Monday,
7  July 9, 2018, commencing at 10:00 a.m.
8        That prior to being deposed, the witness was
9  duly sworn by me to testify to the truth.  That I
10  thereafter transcribed my said stenographic notes via
11  computer-aided transcription into written form, and
12  that the typewritten transcript is a complete, true
13  and accurate transcription of my said stenographic
14  notes.  That review of the transcript was requested.
15        I further certify that I am not a relative,
16  employee or independent contractor of counsel or of
17  any of the parties involved in the proceeding, nor a
18  person financially interested in the proceeding, nor
19  do I have any other relationship that may reasonably
20  cause my impartiality to be questioned.
21        IN WITNESS WHEREOF, I have set my hand in my
22  office in the County of Clark, State of Nevada, this
23  22nd day of July, 2018.
24        _____
           GARY F. DECOSTER, CCR NO. 790
25

Page 94

DEPOSITION ERRATA SHEET

1
2
3
4  Our Assignment No. J2262034
5  Case Caption:  VILELA vs. VALLEY HEALTH
6
7        DECLARATION UNDER PENALTY OF PERJURY
8
9        I declare under penalty of perjury that I
10  have read the entire transcript of my Deposition taken
11  in the captioned matter or the same has been read to
12  me, and the same is true and accurate, save and except
13  for changes and/or corrections, if any, as indicated
14  by me on the DEPOSITION ERRATA SHEET hereof, with the
15  understanding that I offer these changes as if still
16  under oath.
17
18
19
       Signed on the _____ day of
20  _____, 20___.
21
22
    _____
23
       LELAND JAMES NELSON
24
25

Page 95

DEPOSITION ERRATA SHEET

1
2  Page No._____Line No._____Change to:_____
3  _____
4  Reason for change:_____
5  Page No._____Line No._____Change to:_____
6  _____
7  Reason for change:_____
8  Page No._____Line No._____Change to:_____
9  _____
10  Reason for change:_____
11  Page No._____Line No._____Change to:_____
12  _____
13  Reason for change:_____
14  Page No._____Line No._____Change to:_____
15  _____
16  Reason for change:_____
17  Page No._____Line No._____Change to:_____
18  _____
19  Reason for change:_____
20  Page No._____Line No._____Change to:_____
21  _____
22  Reason for change:_____
23
24  SIGNATURE:_____DATE:_____
25        LELAND JAMES NELSON

Page 96

DEPOSITION ERRATA SHEET

1
2  Page No._____Line No._____Change to:_____
3  _____
4  Reason for change:_____
5  Page No._____Line No._____Change to:_____
6  _____
7  Reason for change:_____
8  Page No._____Line No._____Change to:_____
9  _____
10  Reason for change:_____
11  Page No._____Line No._____Change to:_____
12  _____
13  Reason for change:_____
14  Page No._____Line No._____Change to:_____
15  _____
16  Reason for change:_____
17  Page No._____Line No._____Change to:_____
18  _____
19  Reason for change:_____
20  Page No._____Line No._____Change to:_____
21  _____
22  Reason for change:_____
23
24  SIGNATURE:_____DATE:_____
25        LELAND JAMES NELSON