# **EXHIBIT "2"**

AFFIDAVIT OF MARC ECKSTEIN, M.D., MPH, FACEP
IN SUPPORT OF MEDICAL MALPRACTICE

STATE OF CALIFORNIA        )
                           )   SS:
COUNTY OF Los Angeles      )

MARC ECKSTEIN, M.D., MPH, FACEP, being first duly sworn, deposes and says:

1. I am a medical doctor practicing in the field of Emergency Medicine. I am a Fellow of the American College of Emergency Physicians, a Diplomate and Fellow of the American Board of Emergency Medicine, and am Subspecialty Boarded in Emergency Medical Services. I am also a full-time practicing emergency physician who has been certified by the American Board of Emergency Medicine since 1994. My training and current practice in emergency medicine, coupled with my experience in the treatment of literally thousands of patients with acute leg pain, qualifies me to render opinions regarding the applicable standard of care in the present case. Furthermore, I am and was engaged in the full time practice of Emergency Medicine at all times relevant, including at all times of the alleged malpractice in the present case. I am familiar with the standard of care required at all times relevant to the care provided to Shalynne Ramos and no opinion of mine has ever been disqualified by any court.

2. It is my opinion that the care provided to Shalynne Ramos by Centennial Hills Hospital, including; Tanya Netz PAC; Jill Mcatee, RN and the nursing staff on June 3, 2015, fell below the standard of care as supported by my expert opinion. I am familiar with the standard of care required of the facility, physicians, and nursing staff participating at all times relevant to the care provided to Shalynne Ramos commencing from the time of her arrival in the emergency department to the time of her subsequent discharge and departure. I can state to a reasonable

degree of medical probability that the care provided to Shalynne Ramos fell below the acceptable and applicable standard of care and caused the death of Shalynne Ramos on June 28, 2015.

3. My opinion is based upon a review of the following records:

   a.) Centennial Hills Hospital; June 3, 2015.

   b.) Research Medical Center; June 25 through June 28, 2015.

   c.) Certificate of Death; July 22, 2015.

   d.) Affidavit of Amy Vilela; May 29, 2016.

   e.) Affidavit of Leland Nelson; May 29, 2016.

No further records were provided for my review.

4. To briefly summarize, Shalynne Ramos was a 22-year-old obese, black female smoker with sickle cell trait, who was on the Nuva Ring birth control.

5. In December 2014, due to chronic knee pain, Ms. Ramos underwent MR imaging in April 2015 which confirmed an ACL injury. On May 23, 2015, she drove from Missouri to Nevada (which took approximately 22 hours) and, per her family, developed increasing pain in her lower extremity distal to the knee.

6. Ms. Ramos arrived in Las Vegas on May 25. Immediately upon arrival, she began complaining to her mother and her boyfriend of pain and swelling in her knee and lower leg.

7. On June 3, she was with her boyfriend who inadvertently injured the woman's left knee after lifting her. He took her to Centennial Hills emergency department where routine radiographs were negative. She was treated with an immobilizer and told to obtain insurance in order to secure outpatient orthopedic reevaluation.

8. According to the affidavits, she told the hospital that she had pain in her knee and lower leg, including the calf area. The records reflect that that she was there for pain in her knee

and below. According to the affidavit of Leland Nelson, the hospital did not ask for a detailed medical history.

9. According to the affidavit of Amy Vilela, Ms. Ramos had the sickle cell trait and was well aware of it. Sickle cell trait is a known increased risk for blood clots. She also had PCOS. She had the Nuva ring and was on metformin. The Nuva ring is a known increased risk for blood clots, especially when, as here, tobacco use and obesity are present.

10. According to Leland Nelson, Ms. Ramos was never asked about her medical history.

11. After discharge from the hospital, according to the affidavits of Leland Nelson and Amy Vilela, for the next three weeks, Ms. Ramos continued to complain, including to Ms. Vilela and Mr. Nelson, about the pain and swelling in her knee and lower leg, including the calf area. In addition, she became increasingly short of breath over this period. According to Mr. Nelson, Ms. Ramos was never instructed by the hospital staff or physicians regarding the proper use and pressure for the mobilization device and she was never warned about the danger of blood clots or the danger of sitting for long periods of time such as in a car or an airplane, despite the fact that she had just come to Las Vegas from out of town.

12. Approximately 3 weeks later, on June 25, 2015, Ms. Ramos flew back to Missouri. Shortly thereafter (that evening or early the next morning), she developed chest pain and increased shortness of breath. On June 26, 2015, she was rushed to Research Medical Center Hospital where she was diagnosed with an acute pulmonary embolism. She died there on June 28, 2015.

13. According to Amy Vilela, the doctors at Research Medical Center Hospital informed Ms. Vilela and Ms. Vilela's sister (Ms. Vilela's sister is an ER Nurse at Research Medical Center) that Ms. Ramos had a blood clot in her lower leg that was so massive that part of

it had broken off and gone into her lung. The doctors also informed her that due to the size of the remaining portion of the clot, despite the use of clot thinners, it was obvious to them that the clot must have been there all the way back on June 3, 2015 when Ms. Ramos went to the Centennial Hills emergency department in Las Vegas. The doctors also informed Ms. Vilela and her sister that the Research Medical Center that it was highly likely that the clot began to form when Ms. Ramos drove from Missouri to Las Vegas on May 23 to 25, 2015.

14. Consequently, it can be stated to a reasonable degree of medical certainty that Centennial Hills Hospital; Tanya Netz PAC; Jill Mcatee, RN and the nursing staff on June 3, 2015, fell below the standard of care and breached the applicable standard of care when they failed to take an adequate history, a list of Ms. Ramos' medications, and perform a proper physical examination. The physical exam of the affected lower extremity was a limited exam of the knee; there was no documentation of the joints above and below the knee; no mention of edema, and mention of any asymmetry when compared to the contralateral leg. Had a proper history and physical been taken the providers at Centennial Hospital ED would have considered a deep venous thrombosis (DVT) as part of their differential diagnosis, given the patient's obesity, tobacco use, sickle cell trait, her use of the NuvaRing, and her just having completed an extremely long drive. It is more likely than not that had the standard of care been met, Ms. Ramos would have had a duplex ultrasound performed during her ED visit on June 3, 2015, and with proper treatment, the DVT would not have progressed and resulted in a massive pulmonary embolism would ultimately resulted in her cardiac arrest and her demise. Ms. Ramos' presentation, along with her severe risk factors for formation of blood clots, should have led a reasonable practitioner to specifically rule-in or rule-out the presence of a blood clot in Ms. Ramos's leg. Despite these severe risk factors for formation of blood clots that this patient

4

presented, the ED providers and nursing staff failed to conduct an adequate examination of this patient. An adequate examination and subsequent ultrasound would, to a high degree of medical probability, have identified the blood clot that had formed in Ms. Ramos's lower leg. Such signs, symptoms, and risk factors would have led any reasonable practitioner, to order an ultrasound of Ms. Ramos leg to examine her for presence of a blood clot. To a high degree of medical probability, the ultrasound study would have been positive for a blood clot. Consequently, but for Centennial Hills Hospital, Tanya Netz PAC; Jill Mcatee, RN and the nursing staff departing from the standard of care during their management of Ms. Ramos on June 3, 2015, Ms. Ramos would still be alive. The aforementioned breaches of the standard of care resulted in the death of Ms. Ramos.

15. I am prepared testify to these facts and opinions as stated above and will provide a detailed analysis to support my opinions. All of the opinions expressed herein are offered to a reasonable degree of medical probability.

MARC ECKSTEIN, M.D., MPH, FACEP

SUBSCRIBED AND SWORN TO before me this 22 day of June, 2016.

Notary Public in and for Said County and State

_____
NOTARY PUBLIC

LILY QUAN
Commission # 2114850
Notary Public - California
Los Angeles County
My Comm. Expires Jul 6, 2019

5

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**              CIVIL CODE § 1189

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California )
County of __Los angeles__ )

On __JUN 2 2 2016__ before me, __Lily Quan, Notary Public__,
       Date                                Here Insert Name and Title of the Officer

personally appeared __Marc K. Eckstein__
                              Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

[Notary Seal: LILY QUAN, Commission # 2114850, Notary Public - California, Los Angeles County, My Comm. Expires Jul 6, 2019]

Signature _____
              Signature of Notary Public

Place Notary Seal Above

―――――――――――――― OPTIONAL ――――――――――――――
Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.

**Description of Attached Document**
Title or Type of Document: __Affidavit of Marc Eckstein__ Document Date: __June 22, 2016__
Number of Pages: __3__ Signer(s) Other Than Named Above: __No other signer__

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☑ Individual      ☐ Attorney in Fact
☐ Trustee         ☐ Guardian or Conservator
☐ Other: _____
Signer Is Representing: _____

Signer's Name: _____
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Individual      ☐ Attorney in Fact
☐ Trustee         ☐ Guardian or Conservator
☐ Other: _____
Signer Is Representing: _____

©2014 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)   Item #5907