# EXHIBIT A

*Valley Health System, LLC d/b/a Centennial Hills Hospital and Medical Center's Reply to Plaintiff's Opposition to Defendant Valley Health System's Motion for Summary Judgment (and any Joinders Thereto)*

# EXHIBIT A

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2                  DISTRICT OF NEVADA
 3
    AMY VILELA, an individual;
 4  JOZETTE FIGUEREDO, an individual;
    AMY VILELA, a Special Administrator
 5  of the Estate of SHALYNNE RAMOS,
 6            Plaintiffs,
 7        vs.         CASE NO. 2:16-CV-01503
 8  VALLEY HEALTH SYSTEM, LLC, d/b/a
    CENTENNIAL HILLS HOSPITAL MEDICAL
 9  CENTER, a Nevada Limited Liability
    Company; UNIVERSAL HEALTH SERVICES
10  OF DELAWARE, INC., a Delaware
    corporation; TANYA NETZ, PAC; JILL
11  MCATEE, RN; DOE Defendants I
    through X, inclusive; ROE NURSES
12  I through XX, inclusive; ZOE
    HOSPITALS or OTHER MEDICAL
13  FACILITIES I through X; and
    ROE CORPORATIONS I through X,
14  inclusive,
15            Defendants.
    ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
16              DEPOSITION OF
17            LELAND JAMES NELSON
18
                July 9, 2018
19
                 10:00 a.m.
20
21           7900 West Sahara Avenue
                 Suite 200
22             Las Vegas, Nevada
23
24       Gary F. Decoster, CCR No. 790
25
```

**Page 2**

```
 1          APPEARANCES OF COUNSEL
 2
 3  For the Plaintiffs:
 4                LAW OFFICES OF CASEY D. GISH
                  CASEY D. GISH, ESQ.
 5                5940 South Rainbow Boulevard
                  Las Vegas, Nevada  89118
 6                702.583.5883
                  702.483.4608  Fax
 7                casey@gishlawfirm.com
 8
 9  For the Defendants Valley Health System, LLC
    d/b/a Centennial Hills Hospital Medical Center
10  and Jill Mcatee, RN:
11                HALL PRANGLE & SCHOONVELD, LLC
                  CASEY TYLER, ESQ.
12                1160 North Town Center Drive
                  Suite 200
13                Las Vegas, Nevada  89144
                  702.889.6400
14                702.384.6025  Fax
                  ctyler@hpslaw.com
15
16  For the Defendant Tanya Netz, PAC:
17
                  JOHN H. COTTON & ASSOCIATES, LTD.
18                TODD WEISS, ESQ.
                  7900 West Sahara Avenue
19                Suite 200
                  Las Vegas, Nevada  89117
20                702.832.5909
                  702.832.5910  Fax
21                tweiss@jhcottonlaw.com
22
23
24
25
```

**Page 3**

```
 1            INDEX OF EXAMINATION
 2
 3  WITNESS:  LELAND JAMES NELSON
 4
 5  By Mr. Tyler                          4
 6  By Mr. Weiss                         78
 7  By Mr. Gish                          88
 8  By Mr. Weiss                         89
 9  By Mr. Gish                          90
10
11
12
13
14
15
16
17            INDEX TO EXHIBITS
18
                                    Initial
19  Exhibit        Description      Reference
20
      A          Text messages        69
21
22
23
24
25
```

**Page 4**

```
 1      Deposition of Leland James Nelson
 2              July 9, 2018
 3       (Prior to the commencement of the
 4  deposition, all of the parties present agreed to
 5  waive statements by the court reporter, pursuant
 6  to Rule 30(b)(4) of NRCP.)
 7
 8      LELAND JAMES NELSON, having been first duly
 9  sworn, was examined and testified as follows:
10              EXAMINATION
11  BY MR. TYLER:
12    Q.  Good morning.  I introduced myself briefly
13  before we went on the record.  My name is Casey Tyler.
14  I represent Valley Health Systems, which would be
15  Centennial Hills Hospital, in certain litigation
16  that's been filed on behalf of Shalynne as well as her
17  family.
18      You're here to testify as a fact witness
19  regarding certain circumstances that happened with
20  regard to the underlying facts of the case; do you
21  understand that?
22    A.  Yes.
23    Q.  Okay.  Have you ever given a deposition
24  before?
25    A.  No.
```



Page 33

1  remember him being there, so . . .
2     Q.  And just him or did he have the other kids
3  with him, too?
4     A.  I think it was just him because I think the
5  babysitter came.  I think the babysitter maybe was --
6  was she there?
7     Q.  You'd probably remember little kids running
8  around an ER, though.  They weren't there?
9     A.  Yeah, they weren't -- I know the kids weren't
10  there.  I know the little kids weren't there.
11     Q.  Okay.  So when you first walked in the
12  hospital, all three of you were present?
13     A.  It was -- I want to say -- no, actually, no,
14  it was just me and Shalynne, and then the dad came
15  about maybe five minutes later.
16     Q.  So once you walk into the ER, I'm assuming
17  you go over to the intake area?
18     A.  Um-hum.
19     Q.  That's a yes, right?
20     A.  Oh, yes.
21     Q.  Okay.  Describe for me then what happens once
22  you get to the intake area.
23     A.  She goes up there.  She tells them, you know,
24  her knee hurts.  And she's calmed down a little bit
25  then, so she's like my knee and like my lower leg is

Page 34

1  starting like -- is starting to hurt.  And then they
2  asked to have her fill out paperwork and they ask if
3  she has insurance.
4     Q.  As far as what she initially complained, she
5  told them her knee hurts.  What -- do you remember
6  anything specific or you just remember just generally
7  this is what she said?
8     A.  Like I just remember her saying that her knee
9  hurts and that her leg is starting to hurt because she
10  -- like I said, she calmed down some, so it was like
11  she started feeling --
12     Q.  Okay.  She starts to fill out the paperwork.
13  They ask if she has insurance.  Then what happens
14  next?
15     A.  She says no, she says she doesn't have
16  insurance, and they say, you know, well, we don't know
17  how much -- how much we -- what we can -- how much we
18  can do because you don't have insurance.
19     Q.  They said we don't know how much we can do
20  because you don't have insurance?
21     A.  Yes.
22     Q.  And this is the same intake person?
23     A.  Yes.
24     Q.  Okay.  What happens next?
25     A.  She -- her stepdad is there, so he tried to

Page 35

1  see if he can -- if he can do something to where she
2  can be on his insurance or if it's possible that she
3  can be on his insurance, and he's on the phone with
4  his insurance people.  I guess they pretty much said
5  that no, and then we sit and wait.
6     Q.  At what point had the stepdad arrived?  Is
7  that while she's filling out the paperwork?
8     A.  She's filling out the paperwork.  By the time
9  we got the paperwork he came already.  He was already
10  there sitting down with us.
11     Q.  Okay.  When they said -- when she told them
12  that she didn't have insurance, did they say that we
13  can't treat you at all or just that it might be really
14  expensive or do you remember any of the specifics
15  about how that conversation went?
16     A.  Well, they said we might not be able to help
17  out that much and it's going to be -- that she did --
18  that they said it's going to be -- that it could
19  possibly be really expensive if you don't have
20  insurance.
21     Q.  So they never specifically said we won't
22  treat you.  They just said without your insurance,
23  this might cost a lot of money?
24     MR. GISH:  Asked and answered,
25  mischaracterizes his testimony.

Page 36

1     Go ahead, you can answer.
2  BY MR. TYLER:
3     Q.  You can answer.
4     A.  Oh.  Say it again.
5     Q.  Sure.  It wasn't something where they
6  specifically said, well, if you don't have insurance,
7  tough luck, we're not going to treat you.  It was more
8  of something along the lines of we might be able to
9  treat you, but it might cost you a lot of money?
10     MR. GISH:  Same objections.
11     Go ahead and answer.
12     THE DEPONENT:  Well, I remember them saying
13  it was going to be expensive and I remember them
14  saying that we don't know how much we can possibly
15  help you.
16  BY MR. TYLER:
17     Q.  What I'm trying to understand, was there a
18  point where they ever said we can't treat you without
19  insurance, period, or was it more of --
20     A.  No, they didn't say -- no, they didn't say we
21  can't treat you, period.
22     Q.  Okay.  But they did say if we treat you
23  without insurance, it might be expensive?
24     A.  They did say that later on, I think.
25     Q.  So at that point I'm assuming you're going to



**Page 53**

1 I've examined your leg, it looks like you might need
2 surgery, but in order to have surgery completed, you
3 need to go see a specialist and you need to get
4 insurance; was that how it unfolded?  I'm just trying
5 to understand.
6    A.   Yeah.
7    Q.   Okay.
8    A.   I think she -- like the specialist is
9 supposed to do surgery or something like that, not
10 them.
11    Q.   Okay.  So the issue with the insurance and
12 need to see a specialist was with regard to potential
13 surgery?
14    A.   Well, the way I understood it was that it
15 seemed like the specialist was going to do the surgery
16 or something like that.
17    Q.   Any other recollection of that interaction
18 with the PA?
19    A.   No, just pretty much what I told you.  She
20 just told us to sit here and wait.
21    Q.   So other than, you know, we can't do a
22 surgery here in the ER, you're going to need to follow
23 up with a specialist on that, was there any other care
24 that they said that they wouldn't or couldn't provide?
25    A.   They just said they couldn't -- they couldn't

**Page 54**

1 do no more, nothing else about it, and then they just
2 gave her a brace and some crutches and said -- and
3 then just let us go.
4    Q.   And what I'm trying to make sure I'm clear on
5 is, there was nothing else that, you know, Shalynne
6 said I need this or I want this or, you know, you
7 haven't asked me about this and they said we can't
8 treat you, we won't treat you, other than the surgery?
9    A.   Just the MRI.  She just said she wanted an
10 MRI and they said that she couldn't -- that they
11 couldn't give it to her.
12    Q.   So anything besides the MRI and the fact that
13 they couldn't do surgery?
14    A.   That's all I can remember, was that it was --
15 that they wouldn't give her an MRI.
16    Q.   Did you get the impression that the PA
17 actually took her time and examined the knee?
18    A.   I don't feel like she did because it was --
19 because she wasn't there that long.  You know, like
20 she was just like, she was there, she just talked and
21 then just -- and then she left and we didn't see her
22 again and then . . .
23    Q.   What about it made you feel that she didn't,
24 just the duration of the time with you?
25    A.   The duration, it's like it wasn't -- I guess

**Page 55**

1 I just felt like it should have been like, like more
2 and like she should like -- I felt like she should
3 have did more, I don't know what, but I felt like she
4 should have did more other than just say, oh, well,
5 she looked at it, oh, yeah, you might need surgery,
6 you need insurance, go to a specialist, and that was
7 it.
8    Q.   Okay.  And to make sure we're clear --
9    A.   And --
10    Q.   -- you know for sure she looked at the x-ray?
11    A.   Um-hum.
12    Q.   And she explained the x-ray?
13    A.   Um-hum.
14    Q.   Those are yes?
15    A.   Yes, yes, sorry, yes, yes.
16    Q.   And she actually physically examined her
17 knee?
18    A.   Yes.
19    Q.   And she asked Shalynne about her knee?
20    A.   Yes, like where it was -- like if it was
21 hurting, yes.
22    Q.   Okay.  What else did you feel should have
23 been done during the exam that wasn't?
24    A.   I just feel like -- like I say, I don't know
25 the whole procedure, but like I say, she asked for an

**Page 56**

1 MRI, like I feel like she should have got the MRI, you
2 know, and I'm not -- like I say, I'm not
3 professionally whatever, but like they should have
4 like -- if they saw like the knee was red, it's like I
5 don't know, just like, like do more tests on it.  They
6 should have did more tests, I feel like, other than
7 just an x-ray.
8    Q.   Do you feel the PA was answering Shalynne's
9 questions?
10    A.   Yeah, she answered them.
11    Q.   Anybody else present during those
12 interactions with the PA other than you and Shalynne
13 and the PA herself?
14    A.   I want to say her brother was in there, in
15 the room.
16    Q.   Shalynne's brother?
17    A.   I want to say yes.
18    Q.   Who is that?
19    A.   Josiah.
20    Q.   What point did Josiah arrive?
21    A.   About maybe like five, ten minutes after we
22 was in the room; maybe ten minutes after the room.
23    Q.   So while you're in the ER treatment area,
24 after the x-ray but waiting for the PA, he arrived?
25    A.   Um-hum.

